652 F.2d 617
 Coleman A. YOUNG, Individually and as Mayor, City of
Detroit, and City of Detroit, a Municipal
Corporation, Plaintiffs-Appellees,
v.
Philip M. KLUTZNICK, Secretary of Commerce of the United
States, and Vincent P. Barabba, Director, Bureau
of the Census, Defendants-Appellants.
 Nos. 80-1751, 81-1027.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 12, 1981.
Decided June 15, 1981.
 
 William Kanter, Douglas N. Letter, Michael Jay Singer, Civil Division, Appellate Staff, Dept. of Justice, Washington, D. C., Walter E. Dellinger, for defendants-appellants.
 James A. Tuck, Robert A. Sedler, Wayne State Univ. Law School, Joseph Baltimore, Asst. Corp. Counsel, Detroit, Mich., for the City of Detroit.
 Jim Leach, U. S. House of Representatives, Washington, D. C., for amicus curiae.
 James E. Moore, Deputy Atty. Gen., Richmond, Va., for amicus curiae Commonwealth of Virginia.
 Stephen C. Chapple, General Counsel U. S. Conference of Mayors, Washington, D. C., for amicus curiae U. S. Conference of Mayors.
 George W. Crockett, Detroit, Mich., for plaintiffs-appellees in No. 81-1027.
 Before KEITH, MERRITT and MARTIN, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 In this suit by the City of Detroit and its Mayor against the Census Bureau Director and the Secretary of Commerce, the District Court found that the final 1980 census figures would understate the black and hispanic populations nationally and in Detroit by a statistically significant but undetermined figure, unless adjusted. After finding in advance of the completion of the census that such an undercount would occur, the District Judge held that certification and publication of the figures without adjustment would violate the provisions of the Constitution requiring an accurate decennial enumeration of the population for the purpose of apportioning Congressional representation.[1] He construed the Census Act as permitting the use of such an adjusted set of census figures for purposes of determining Congressional representation.[2] He ordered that defendants withhold certification of the census figures to the states and the President, a certification required by statute,[3] until defendants devise and report to the Court for approval a statistically defensible means of adjusting the census figures to include the uncounted segments of the black and hispanic populations.
 
 
 2
 We reverse. Plaintiffs have shown no judicially cognizable injury and lack standing to sue. The claimed injury is based on a state of affairs not yet in existence, and it is so hypothetical in nature that it does not present a controversy capable of judicial resolution.
 
 I. STATEMENT OF THE CASE
 
 3
 A. The Undercount Estimated on the Basis of Studies of the 1970 Census
 
 
 4
 The essential facts are not in dispute. Plaintiffs concede that the Census Bureau in 1980 made a conscientious effort to conduct an accurate head count of a diverse nation of approximately 225 million people using sound demographic methods developed over many years with the advice of leading scholars in many fields. Plaintiffs do not claim that the Census Bureau has discriminated against any class, blacks, hispanics, or others, or any town or region, Detroit or any other place, in the methods used to conduct the head count. On the contrary, all parties agree, including plaintiffs and their experts, that at great cost the Census Bureau, upon the direction of the President and the Congress, has taken new and creative steps during the 1980 census to find and count disadvantaged groups.
 
 
 5
 No claim is made that upper and middle class blacks and hispanics are undercounted in comparison with whites of the same economic class. Rather, plaintiffs have demonstrated the undeniable fact that for a complex set of reasons[4] it is more difficult to count the poor and the uneducated, whether black or white, than the middle class and the well-to-do. Plaintiffs rely on Census Bureau studies of previous census figures that show that, as a group, more blacks are missed than whites because, as a group, blacks are more disadvantaged.[5] Plaintiffs' key witness, Dr. Philip M. Hauser, a former director of the Census Bureau and chairman of the University of Chicago Sociology Department, stated the basic reason for previous undercounts of the black population: "It is not a question of color; it is not the difference in color that makes them hard to count. It is that whole cluster of characteristics associated with color which stands as a proxy for this cluster of characteristics" (App. 405).
 
 
 6
 The demographic and statistical theory that blacks are necessarily undercounted at a substantially higher rate than whites is supported by comprehensive studies of the 1970 census.[6] In that census 203 million people were counted, 178 million of whom were identified as white and 23 million of whom were identified as black. Through a combination of survey methods, the Census Bureau now estimates that the 1970 census undercounted the black and white populations as shown on this graph:
 
 
 7
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 8
 Extrapolating from the studies, the parties agree that the 1970 census probably undercounted the white population by approximately 2%, or 3.5 million, and the black population by approximately 8%, or 1.8 million. Although the Census Bureau is unable to break the undercount down by state or locality, the parties tentatively agree that the largest undercounts probably occurred in the poorer sections of large cities and in certain rural areas of the South.
 
 
 9
 At the time of the trial of this case in August 1980, the Bureau had not completed any interim or final figures for the new census because the tabulation of the census returns was still in process. The parties were unable, therefore, to estimate the 1980 undercount. One of plaintiffs' experts testified that "we don't know anything about the undercount in the 1980 census except some very broad assertions and expectations that the racial undercount will not disappear ...." (Dr. Taeuber, App. 638). Another expert of plaintiffs testified that no one could predict whether the 1970 undercount would be repeated in the 1980 census: "This doesn't mean that this (the 1970 undercount estimate) will be what happens in 1980. I don't know, I repeat, nor does anyone else" (Dr. Hauser, App. 478).
 
 
 10
 The Census Director and other officials testified in detail at the trial about the procedures used and the improvements made in conducting the 1980 census. They predicted hopefully that the added efforts would reduce the undercount. They explained that they had made earlier predictions, based on demographic analysis, that the final 1980 head count would be approximately 222 million and that the undercount would be approximately 5 million, or around 2%. They explained the difficulty and time consuming nature of arriving at a reliable estimate of the undercount. They explained that survey techniques and demographic analysis were not sufficiently advanced as sciences to permit distribution or allocation of the estimated undercount to states and localities on anything other than a pro rata basis using population figures from the census. They explained that since 1790 the census enumeration has never been adjusted to reflect an estimated undercount and that in their opinion Congress by statute had prohibited such an adjustment in the figures used for purposes of Congressional apportionment.[7] Finally, for a combination of reasons, they expressed severe reservations about making such adjustments to the census head count. The reasons included the questionable reliability of any such estimate at the national level, the absence of any sound scientific theory for allocation of the national undercount, however determined, to the states and cities, the risk of undermining public confidence and public use of the census and the likelihood that the internal consistency of census data will be destroyed if hasty adjustments are made which add to states, localities and enumeration districts numbers of people who may not exist.
 
 
 11
 After the trial the District Court ordered defendants to estimate the undercount for blacks and hispanics, adjust the national census count accordingly, allocate the adjusted undercount to states and cities on a pro rata basis and withhold certification of the figures until this task is accomplished. Thereafter, the Supreme Court stayed the portion of the District Court's order requiring defendants to withhold certification of the unadjusted figures to the President and the states.
 
 
 12
 B. The 1980 Undercount Estimates Based on the 1980 Census
 
 
 13
 Two other significant events have occurred during the pendency of this appeal, events which we notice judicially. See Fed.R.Evid. 201. On December 11, 1980, the Census Bureau announced its decision that it would not on its own initiative, voluntarily adjust the 1980 census count for underenumeration but would obviously comply with any final court orders requiring it to do so. In a lengthy position paper supporting its position (filed with the Court at oral argument on February 12, 1981), the Census Bureau stated that "it is now clear" from the tabulation of 1980 returns that the head count "will exceed the April 1980 estimate by a very large margin." Instead of counting 222 million people, as previously estimated, "the minimum final count for the Nation as a whole has reached 225.2 million" and "now is expected to be between 225.7 and 226.0 million persons." These figures come close to the pre-census estimate of the head count plus the pre-census estimated undercount. In the December 11 document, the Bureau stated its view that the 1980 undercount is probably considerably smaller than in prior censuses due to the improvement of census procedures. It says that "the apparent zero undercount results from the under-enumeration of legal residents being offset by enumeration of illegal residents." Based on these circumstances, the Bureau draws the conclusion: "At present, the Bureau has no sound statistical basis for estimating the true undercount or introducing the adjustments." It further explains this conclusion as follows:
 
 
 14
 The relative undercount was probably considerably smaller in 1980 than in earlier censuses but its extent and distribution cannot be reliably defined or estimated because we are not able to measure how many illegals were present and counted. In the absence of reliable information on illegals, and in light of the data now in hand, it is clear that the "true" population and, hence the undercount for 1980 cannot be reliably estimated in the near term, if at all. Because of the much smaller measured undercount, it is our firm judgment on statistical grounds that adjustments for undercount are not in the public interest.
 
 
 15
 45 Fed.Reg. 82874 (1980).
 
 
 16
 The second significant event occurred February 23, 1981, when the Census Bureau released its "1980 Census Population Totals for Racial and Spanish Origin Groups in U. S." That report shows the following figures:
 
 
 17
 Percent
 United States 1980 1970 Distribution
 1980 1970
 Total .............. 226,504,825 203,211,926 100.0 100.0
White ............... 188,340,790 177,748,975 83.2 87.5
Black ................ 26,488,218 22,580,289 11.7 11.1
American Indian,
 Eskimo, and Aleut .... 1,418,195 827,268 0.6 0.4
Asian and Pacific
 Islander ............. 3,500,636 1,538,721 1.5 0.8
Other ................. 6,756,986 516,673 3.0 0.3
 -------------------
Persons of Spanish
 Origin .............. 14,605,883 9,072,602 6.4 4.5
Persons not of
 Spanish Origin ..... 211,898,942 194,139,324 93.6 95.5
 
 The report states:
 
 18
 Comparisons with demographic estimates suggest that the 1980 undercount rate for blacks may be in the range of 4.5 to 5.5% compared to the estimated miss rate of 7.7% in 1970. In short, the Bureau feels that it may have achieved a 30-40% improvement in the undercount rate between 1970 and 1980. Similar analyses for other groups have not been completed.
 
 C. The Remedy Imposed by the District Court
 
 19
 The parties appear to agree that neither the Census Bureau nor any other institution certainly not the federal courts independently have the resources or expertise "to develop a statistical and analytical methodology which will permit adjustment of (the census for) critical variables (i. e., selected subnational geographical units and selected characteristics) in a timely fashion." 45 Fed.Reg. 82877 (1980). The undercount cannot be accurately distributed to "subnational geographic units" because we do not know in which communities the uncounted live. That leaves the remedy adopted by the District Court as the only possible remedy for correcting an undercount, the only remedy that anyone has seriously proposed. This remedy is a so-called "synthetic method" of adjustment. This method, simply stated, distributes an undercount, based on race, age, sex or other characteristics, to counties, cities, states or regions in accordance with the actual local head count already obtained by the census for that particular group. It requires a pro rata distribution of the undercounted elements of the population.
 
 
 20
 The Census Bureau points out that past samples and studies show that there are substantial geographical variations in any undercount and that synthetic distributions "introduce serious distortions not present in the unadjusted data" Id. If it should be the case that all or parts of Minneapolis, Dallas, Pasadena and Pittsburgh are relatively affluent and easy to count, it introduces serious distortions in the census, and in any legislative apportionment based on the census, when we increase their voting strength by adding people who are not there. To give another example of the distortions inherent in the synthetic method, one city whose hispanic population may not be undercounted at all Coral Gables, Florida would receive a population increase, and hence more legislative representation, than a rural county in North Florida whose disadvantaged black and white populations were undercounted at a much higher rate than the national average.
 
 
 21
 The proposed remedy may not redress, but rather may exacerbate the condition to be corrected for another reason as well. If the undercount of whites is on the order of 3 million people (approximately 1.5%) and most of this undercount comes from the approximately 15% of the white population that is hard to count because disadvantaged, as appears to be the case, the synthetic method, employed consistently, would distribute 85% of the white undercount, or 2.5 million people, to the 85% of the white population who are, relatively speaking, better off. Such a distribution would simply have the effect of adding to the voting strength of that segment of the white population which is least undercounted. Since there would appear to be little or no undercounting of the top 25% of the white population, such a distribution has a practical effect of taking voting strength from disadvantaged whites and giving it to advantaged whites.
 
 
 22
 The same result occurs when we distribute the black undercount. The major portion of an estimated 1 million black undercount (approximately 4%) apparently comes from the approximately 30% of the black population at or below the poverty line because they are hard to count. Yet the synthetic method would add 70% of the black undercount to the voting strength of the more advantaged group, the black middle class. As in the case of whites, distribution of the black undercount according to the synthetic method has the effect of taking voting strength from the disadvantaged black population and giving it disproportionately to the more advantaged members of the same class.
 
 II. JUSTICIABILITY
 A. Standing
 
 23
 The issue of standing arises from the language in Article III that "(t)he judicial Power shall extend to ... Cases ... (and) Controversies...." U.S.Const. art. III, § 2. The Supreme Court has held that restrictions upon standing are necessary to guarantee that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), "so that federal courts will not be asked to decide 'ill-defined controversies over constitutional issues,' United Public Workers of America v. Mitchell, 330 U.S. 75, 90 (67 S.Ct. 556, 564, 91 L.Ed. 754) (1947), or case(s) ... of 'a hypothetical or abstract character,' Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240 (57 S.Ct. 461, 463, 81 L.Ed. 617) (1937)." Id. at 100, 88 S.Ct. at 1952. See also Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37-39, 96 S.Ct. 1917, 1923-24, 48 L.Ed.2d 450 (1976); Warth v. Seldin, 422 U.S. 490, 498-500, 95 S.Ct. 2197, 2204-2205, 45 L.Ed.2d 343 (1975); Linda R.S. v. Richard D., 410 U.S. 614, 616-17, 93 S.Ct. 1146, 1147-48, 35 L.Ed.2d 536 (1973). In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), the Supreme Court further characterized its doctrine of standing and reviewability as a "rule of self-restraint" "for its own governance." In addition to the minimum requirements imposed by Article III, courts have developed rules to limit their exercise of jurisdiction in particular cases when prudential considerations militate against invocation of the judicial process. See, e. g., Warth v. Seldin, supra, 422 U.S. at 499-500, 95 S.Ct. at 2205, and cases cited therein.
 
 
 24
 In Duke Power Co. v. Carolina Env. Study Group, 438 U.S. 59, 72-73, 98 S.Ct. 2620, 2629-2630, 57 L.Ed.2d 595 (1978), the Court stated that the standing rule requires "not only a 'distinct and palpable injury' to the plaintiff ... but also a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," "or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." Thus, when focusing on the question of a plaintiff's standing the relevant considerations are the existence of an injury, its cause, and the existence of a remedy for redress of the injury.
 
 
 25
 Our view of the standing issue does not arise because we have any doubts about the values and the general policy that plaintiffs seek to promote in asserting the underlying claim the desire to achieve equality for a racial minority. Rather it arises from the kind of inquiry that is necessary to dispose of the underlying claim for injunctive relief an inquiry based on an assumption that plaintiffs will be injured because the Michigan legislature will act in a particular way and an assumption that the injury can be remedied by a pro rata distribution to cities and towns across the nation of whatever national undercount exists. We hold that the first assumption is not warranted. We do not find it necessary to pass on the validity of the second assumption.
 
 
 26
 Plaintiffs' theory of standing is concisely stated in their brief. They do not claim that the undercount deprives the State of Michigan of congressional representation.
 
 
 27
 The injury to the Plaintiff Young's right of equal representation and equal weight of vote in the United States House of Representatives relates to the use of unadjusted census data for the apportionment of Congressional representation within the State of Michigan ....
 
 
 28
 The City of Detroit will be disparately undercounted in relation to the predominantly White suburbs and other areas of the state having little or no Black or Hispanic population.
 
 
 29
 ....
 
 
 30
 The injury to the Plaintiff Young's right to equal representation and equal weight of vote in the United States House of Representatives results directly from the fact that the Census Bureau certifies an official population count of the cities and sub-state areas of the State of Michigan that is not adjusted for the differential undercount of Blacks and Hispanics. The official population count as certified by the Census Bureau will be used by the Michigan Legislature or the federal courts if necessary ... as it will be by the legislatures of all the other states, to redistrict representative districts for the United States House of Representatives. Because that official population count is not adjusted for the Black and Hispanic differential undercount, an apportionment pursuant to that official population count has caused and will cause injury to the Plaintiff Young's right to equal representation and equal weight of vote.
 
 
 31
 Brief of Appellee 54-57 (emphasis added).
 
 
 32
 If the Constitution leaves the Michigan legislature free to adjust the census figures reported by the Census Bureau, then the Michigan legislature might adjust the census data, thereby preventing the anticipated harm. No injury, of course, has occurred as yet; this suit is an attempt to preclude the possibility of future harm. If the Michigan legislature may adjust for the undercount, whether the injuries feared by plaintiffs do in fact arise does not depend upon defendants' actions. An independent third party, the Michigan state legislature, would play a necessary role in determining the effects of the census upon plaintiffs.
 
 
 33
 Contrary to the assertions by plaintiffs, the state legislature is not required by the Constitution to accept in all respects the census data supplied by the Bureau. Article 1, § 2 of the Constitution requires that "as nearly as is practicable" one person's vote is to be worth as much as another's vote in apportioning congressional representation. Kirkpatrick v. Preisler, 394 U.S. 526, 527-28, 89 S.Ct. 1225, 1227, 22 L.Ed.2d 519 (1969), citing Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 529-530, 11 L.Ed.2d 481 (1964). To achieve this goal, limited population variances from district to district will be tolerated only if these variances are "unavoidable despite a good-faith effort to achieve absolute equality, or ... (if) justification is shown." Kirkpatrick v. Preisler, 394 U.S. at 531, 89 S.Ct. at 1229. Kirkpatrick rejected as a justification the claim that population variances were due to legislative attempts to take into account projected population shifts. The Court concluded that when the population changes over the ten year period between censuses, states that are redistricting may properly consider the population shifts. But "(f)indings as to population trends must be thoroughly documented and applied throughout the state in a systematic, not an ad hoc, manner." Id. at 535, 89 S.Ct. at 1231. It is evident that states may use adjusted population figures when redistricting between census years. There is no reason to believe that states would not be free to adjust census figures for redistricting in the census year, as long as the adjustment is "thoroughly documented" and applied in a "systematic" manner. See also Burns v. Richardson, 384 U.S. 73, 91, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966) (in state legislative apportionment cases, the Constitution "does not require the States to use total population figures derived from the federal census as the standard" of measurement).
 
 
 34
 The goal in any redistricting is to assure that "as nearly as is practicable one man's vote in a congressional election is worth as much as another's." Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 529-530, 11 L.Ed.2d 481 (1964). If the Census Bureau had erroneously undercounted the Detroit area by 25%, the Michigan legislature would not be precluded from adjusting the figures for purposes of congressional apportionment. Although the Constitution prohibits subterfuge in adjustment of census figures for purposes of redistricting, it does not constrain adjustment of census figures if thoroughly documented and applied in a systematic manner.
 
 
 35
 Plaintiffs also argue, however, that even if the state legislature is not constitutionally compelled to use the Bureau's census data, nonetheless it is very probable that the legislature will accept the data without adjustment. Thus the Michigan legislature is not an intervening independent actor, and the Bureau must still be considered the cause of plaintiff's injury. We disagree. Having found no legal compulsion that the state act in a certain way, we may not predict what decisions the state legislature will, in fact, make. The legislature may decide to conduct a recount or to adjust the state population to take the undercount into consideration for the purpose of apportioning Congressional seats. Thus we simply do not know whether plaintiffs will be harmed by the decision of the Bureau not to adjust its figures. The presence of an intervening actor casts doubt at least at the present time upon the existence of the injury felt by plaintiffs. The Supreme Court has stated, "(T)he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon, supra, 426 U.S. at 41-42, 96 S.Ct. at 1925-1926.[8]
 
 B. Ripeness
 
 36
 Standing doctrine imposes constitutional limitations on federal courts' jurisdiction. Even when jurisdiction is technically present, however, the Supreme Court has recognized that " 'problems of prematurity and abstractness' ... may prevent adjudication in all but the exceptional case." Buckley v. Valeo, 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976), quoting Socialist Labor Party v. Gilligan, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972). Such questions of ripeness, the Court has held, are resolved through two inquiries. Courts must first "determine whether the issues tendered are appropriate for judicial resolution," and then "assess the hardship to the parties if judicial relief is denied at that stage." Toilet Goods Association v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967). Plaintiffs satisfy neither inquiry in this case.
 
 
 37
 The question whether tendered issues are appropriate for judicial resolution clearly "bears close affinity" to questions of standing. Warth v. Seldin, 422 U.S. 490, 499 n.10, 95 S.Ct. 2197, 2205 n.10, 45 L.Ed.2d 343 (1975). The precise focus of ripeness doctrine is that it is "peculiarly a question of timing." Regional Rail Reorganization Act Cases, 419 U.S. 102, 140, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974). As Justice Fortas has pointed out in the context of pre-enforcement attacks on administrative regulations, the reason for deferring consideration of abstract or premature claims is to allow governmental processes
 
 
 38
 an opportunity to function to iron out differences, to accommodate special problems.... The courts do not and should not pass on these complex problems in the abstract and the general because these regulations peculiarly depend for their quality and substance upon the facts of particular situations. We should confine ourselves as our jurisprudence dictates to actual, specific, particularized cases and controversies, in substance as well as in technical analysis.
 
 
 39
 Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; Toilet Goods Association v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697; Gardner v. Toilet Goods Association, 387 U.S. 167, 200, 87 S.Ct. 1526, 1543, 18 L.Ed.2d 704 (1967) (Fortas, J., concurring and dissenting). Because the Michigan state legislature has not yet expressed its reaction to the census enumeration, the issue before this Court has not become as "specific" or as "particularized" as it will become after the legislature acts. Heightened public sensitivity to the problems of census undercounts makes past reliance on census figures an uncertain predictor of future legislative action. Even if the ultimate response of the legislature could be predicted with some confidence, however, the fact that it is a representative, deliberative organ of state government rather than a private party must make this Court hesitate to exercise its power so as to narrow the range of solutions it might consider. As the Supreme Court has pointed out, the reasons a governmental body might provide for its actions are important in review of those actions. Toilet Goods Association v. Gardner, 387 U.S. at 163, 87 S.Ct. at 1524.
 
 
 40
 Consideration of the "hardship to the parties" of a present denial of judicial relief also points toward a refusal to adjudicate plaintiffs' claim. The dilution of voting power on which they base their claim may not occur at all, and cannot occur until the Michigan legislature acts. That fact makes plaintiffs' claim unlike that in Duke Power Co., where the Court rejected a ripeness claim because the plaintiffs would sustain immediate injury were the Court not to act. 438 U.S. at 81, 98 S.Ct. at 2634.
 
 
 41
 Accordingly, the judgment of the District Court is reversed.
 
 
 42
 KEITH, Circuit Judge, dissenting.
 
 
 43
 In a carefully considered and well written opinion, District Judge Horace W. Gilmore concluded that the Census Bureau must adjust its final 1980 census totals to correct the widely acknowledged and differential undercounting of Hispanics and black Americans. Today, the majority reverses in an opinion that is rife with legal and factual misanalysis. I must respectfully dissent.
 
 I.
 
 44
 Although the majority opinion contains a substantial amount of far ranging dicta, its holding is limited, technical, and I think, myopic.[1] It rules that this case is not justiciable because either the plaintiffs lack standing or because the controversy presented by the parties is not sufficiently ripe. Judge Merritt, speaking for the majority, rules that "(t)he plaintiffs have shown no judicially cognizable injury and lack standing to sue. The claimed injury is based on a state of affairs not yet in existence, and it is so hypothetical in nature that it does not present a controversy capable of judicial resolution."
 
 
 45
 I respectfully disagree with both parts of this analysis. I believe that the court misuses standing and ripeness doctrines in order to avoid grappling with a serious question of constitutional harm.[2] I would reach the merits, and although I am in substantial agreement with the district court's analysis, I would remand this case to the district court for further factfinding in light of data which has become available subsequent to the district court's decision.
 
 A. Standing
 
 46
 I agree that the majority correctly outlines the modern law of standing. In Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Supreme Court established the injury-in-fact requirement for constitutional standing. Subsequent decisions have made clear that in order to show injury-in-fact, a plaintiff must establish a "distinct and palpable injury" and a fairly traceable causal connection between the claimed injury and the challenged conduct. See Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); Orr v. Orr, 440 U.S. 268, 271-73, 99 S.Ct. 1102, 1107-08, 59 L.Ed.2d 306 (1979); Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72-3, 98 S.Ct. 2620, 2629-30, 57 L.Ed.2d 595 (1978). A plaintiff can satisfy the causation requirement by showing that there is a "substantial likelihood" that the relief requested of the court will redress the claimed injury. Duke Power Co. v. Carolina Environmental Study Group, supra, at 75 n.20, 98 S.Ct. at 2631 n.20; J. Nowak, Handbook On Constitutional Law 73-9 (1978); id. 1978 Pocket Part at 7; L. Tribe, American Constitutional Law 92 (1978). Although the court correctly outlines the law of standing, it misapplies that law to the facts of this case.
 
 
 47
 The majority does not seriously dispute the fact that plaintiffs have established the requisite injury for standing purposes. The district court found below that the plaintiffs would lose a proportionate amount of political representation equal to the amount of differential undercounting in the federal census. There is little question that such a loss of political representation constitutes the kind of "distinct and palpable" injury necessary to establish constitutional standing. See, e. g., Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). But the majority concludes that the plaintiffs nevertheless lack standing because the second prong of the injury-in-fact requirement is not satisfied. It holds that the plaintiffs' loss of representation is not caused by the Census Bureau's differential undercounting of minorities, but is caused solely by the redistricting decisions of the Michigan state legislature. It bases this finding of intervening causation on the fact that the state legislature is not required by law to use the sub-state population totals supplied by the Bureau. If the state legislature chooses to use Bureau-supplied figures for state reapportionment, the majority holds that this decision would be an independent act breaking the chain of causation between the challenged actions of the Census Bureau and the injury to the plaintiffs. I cannot accept this conclusion because, in my view, it construes the causation component of the injury-in-fact requirement far too strictly.
 
 
 48
 The causation component of modern standing analysis has been grafted from the causation theory of the law of torts. In tort law, two forms of causation are recognized. The first is "but for" causation or the sine qua non rule. The second is "proximate" or "legal" causation. I think it is clear that under either approach causation exists in the circumstances of this case for purposes of establishing constitutional standing.[3]
 
 
 49
 In "but for" causation, a defendant's conduct is not a cause of the event if the event would have occurred without it. See W. Prosser, Law of Torts 238-9 (4th ed. 1971); Smith, Legal Causes in Actions of Tort, 25 Harv.L.Rev. 103-9 (1911). Under this formula, if injury would not have occurred to the plaintiff but for defendant's conduct, the defendant is liable for the whole injury "regardless of its position in the string of acts leading to the injury though one or more of the other causes contributing to the result also involved wrongdoing on the part of other persons." F. Harper & F. James, 2 The Law of Torts 1121-22 (1956).[4]
 
 
 50
 Proximate cause, on the other hand, refers to the "more or less undefined considerations which limit liability even where the fact of causation is clearly established." Prosser, supra at 244. Under proximate causation theory, an act occurring after the defendant's action and before the plaintiff's injury can be an "intervening cause", i. e. one which erases any responsibility on the defendant's part. However, "(i)f the intervening cause is one which in ordinary experience is reasonably likely to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances, he may be negligent only for that reason." Id. at 272. In other words, "(f)oreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility." Id. at 273.[5]
 
 
 51
 If the Census Bureau failed to supply sub-state population figures, containing a differential undercounting of minorities, the state legislature could not then reapportion on the basis of those figures. Therefore, "but for" cause is present. As previously mentioned, the district court found that the plaintiffs would lose a proportionate amount of voting representation equal to the amount of the differential undercounting in the federal census. This is the claimed injury of the plaintiffs. It was found by the district court to exist, and for standing purposes this finding is entitled to great weight. The plaintiff could not suffer this injury which was found to exist by the district court "but for" the Bureau's challenged action. Thus, the causation requirement under the first formulation is necessarily met.
 
 
 52
 The Census Bureau's differential undercounting is also the proximate cause of the plaintiff's injury. It is true that the undercount is not the direct cause of the state's malapportionment.[6] However the Michigan legislature's redistricting decision is not an intervening cause since the legislature's use of the defective figures is not an unforeseeable consequence of the Bureau's actions. The parties do not dispute the fact that in its history Michigan has never failed to use federally supplied sub-state population figures. Moreover, the Bureau should know that in recent American history the states have almost invariably used federally-supplied figures for reapportionment.[7] In addition, the Bureau should have been aware of the fact that if the state chooses not to use the federally-supplied figures it would have to use data at least as accurate as that supplied by the Bureau. See Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). Michigan has no already established bureaucracy to gather such data and perhaps has neither the financial nor technical capacity to do so. In fact, since 1959 state law has provided that the state and sub-state totals of the federal decennial census shall be used by the State of Michigan for all election purposes.[8]
 
 
 53
 For the reasons outlined above, it is certainly foreseeable that the state would reapportion on the basis of the inaccurate figures. Therefore, any loss of state representation suffered by the plaintiffs is within the scope of the foreseeable risk created by the Bureau's failure to accurately count minorities. Accordingly, the Bureau's action has to be a cause of the injury and plaintiffs have standing to challenge the conduct.
 
 
 54
 The majority finds that the decision of the state legislature to reapportion on the basis of federally-supplied totals breaks the chain of causation between plaintiffs and the Bureau because as "(a)n independent third party, the Michigan state legislature would play a necessary role in determining the effects of the census upon plaintiffs." I think this rationale misses the point. The state legislature's action would certainly be necessary in order to create the plaintiffs' injury, but this fact does not mean that other concurrent causes are not present as well. If plaintiffs' injury would not occur "but for" the Bureau's differential undercounting, then in my view the undercounting is a concurrent cause of the injury and the causation requirement is satisfied.
 
 
 55
 However, if "but for" causation is not enough to establish standing here, then certainly proximate cause does. If the Bureau could reasonably foresee that the state legislature would use the figures in such a way as to cause the claimed injury to the plaintiffs, then the actions of the state even if it is an independent party cannot break the chain of causation.
 
 
 56
 Recent decisions support my view of the causation requirement's application here. In Duke Power Co. v. Environmental Study Group, supra, the district court discerned a "but for" causal connection between the existence of the Price Anderson Act, the construction of nuclear power plants in the country, and the adverse consequences alleged by the plaintiffs. The petitioners challenged this finding of causation on two grounds in the Supreme Court: (1) that the particular nuclear power plants in question would have been constructed by private companies without the Price Anderson Act's limitation on liability; and (2) that if Congress had not passed the Price Anderson Act it may well have chosen to pursue the nuclear program as a government monopoly as it had done from 1946 to 1954. The Supreme Court rejected both contentions. It held that industry testimony at Congressional hearings on the passage of the Act indicated that the industry would not develop nuclear power facilities without a limitation on liability. In addition, it rejected the contention that the Price Anderson Act was not a "but for" cause of any adverse consequences to the plaintiffs since the government would have undertaken development of nuclear power on its own. It held that "(w)hatever the ultimate accuracy of this speculation, it is not a response to the simple proposition that private power companies now do in fact operate the nuclear-powered generating plants injuring the appellees, and that their participation would not have occurred but for the enactment and implementation of the Price Anderson Act." Id., 438 U.S. at 77-8, 98 S.Ct. at 2632-33. (emphasis added)
 
 
 57
 In Duke Power, "but for" causation was met because the claimed injury of the plaintiff could not have occurred without the presence of the Price Anderson Act. In this case, the plaintiffs' injury would not occur without the defendants' differential undercounting of minorities. Therefore, causation for purposes of standing has to be present in the instant case as well.
 
 
 58
 In Duke Power, the direct cause of the plaintiff's injury was the decision of the private utility companies to construct the nuclear power plants at issue. The effect of the Price Anderson Act was one step removed. Nevertheless the Supreme Court found a causal nexus between the operation of the Price Anderson Act and the claimed injury of the plaintiffs. As I have previously mentioned, an act does not have to be the last in a "string of acts leading to the (plaintiff's) injury" in order for it to be a "but for" cause. See F. Harper and F. James, supra at 11. The sole issue is whether the injury would have resulted without the occurrence of the act. In this case, the defendants' challenged action is not the direct cause of plaintiffs' injury. However, as in Duke Power, the plaintiffs' injury would not result without the occurrence of the defendants' challenged conduct. Thus, causation sufficient enough to establish standing is present even though the defendants' action is not a direct cause.
 
 
 59
 The Court in Duke Power did not specifically address the issue of intervening causation. But, it is clear that construction of nuclear plants and the resultant injury to the plaintiffs were foreseeable results of passage of the Price Anderson Act. This is evident because the Court did not find that the decision of the companies to construct nuclear power plants was an intervening cause that broke the chain of causation between the Price Anderson Act and the claimed injury. The company argued that in the absence of the Act, the government might have constructed such plants on its own or that private companies might have raised the necessary funding under an alternate scheme. However, the Court ruled that prior cases did not require "a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief." Id. at 78, 98 S.Ct. at 2633. The same analysis applies here. In order to demonstrate a traceable link from the Bureau's actions to their claimed injury, the plaintiffs should not be required to negate the "speculative and hypothetical possibilities" that Michigan might: (1) change its long standing law requiring the sole use of federal census totals; and either (2) develop the capacity to conduct an accurate state census or (3) develop the capacity to make accurate adjustments of federal census data. The decision of the Michigan legislature to use raw federally-supplied sub-state totals is a foreseeable consequence of the Bureau's supplying of those figures. Thus, as in Duke Power, there is no intervening causation present.
 
 
 60
 The case at bar is distinguishable from Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In that decision, the Supreme Court found that § 501(c)(3) of the Internal Revenue Code was not the cause of the plaintiffs' failure to receive free emergency medical treatment from the defendant hospital. The Court noted that: "It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." Id. at 43, 96 S.Ct. at 1926. In other words, § 501(c)(3) was not a "but for" cause of the claimed injury and plaintiffs necessarily had no standing to bring the action. As previously discussed, that is not the case here; differential undercounting is a cause of the plaintiffs' injury.
 
 
 61
 Simon apparently provides the basis for the majority's invocation of intervening cause analysis in this case. In Simon, the Supreme Court did state that "Article III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." 426 U.S. at 41-2, 96 S.Ct. at 1925-26. (emphasis added). However, since § 501(c)(3) was not even a "but for" cause of the plaintiff's alleged injury, the Court did not have to explain when for standing purposes an injury is caused by one precedent and not by another. It is extremely doubtful that the above language in Simon precludes concurrent causation in the law of standing.[9]
 
 
 62
 I think there can be no dispute about the fact that the Census Bureau's differential undercounting is a concurrent cause here. Accordingly, for the reasons discussed above, I would find standing for the plaintiffs to bring this action.
 
 B. Ripeness
 
 63
 The majority correctly outlines the Ripeness doctrine. Unfortunately it misapplies this doctrine, just as it misapplies standing. The majority holds that it would be better to wait until the Michigan legislature acts on reapportionment because only then would the issues here be particularized enough for judicial resolution. I disagree. I think the court's invocation of ripeness as a reason to reverse the district court amounts to another smokescreen to justify ducking important questions. The issues presented by this case should be decided now.
 
 
 64
 First, for reasons outlined above, I cannot agree with the majority's statement that "(h)eightened public sensitivity to the problems of census undercounts makes past reliance on census figures an uncertain predicator of future legislative action." The court speculates that the Michigan legislature will depart from its invariable past practice and either adjust federally-supplied census data or use their own data for reapportionment. For the reasons outlined above, I see no reason to believe this will occur.
 
 
 65
 Second, there is no reason to defer to the judgment of a legislative body in this case. The key questions pertaining to the merits of this case are: Is there a differential undercount? Can it be corrected? To answer these questions requires the analysis of expert testimony. If the expert testimony shows that there is an ascertainable differential undercount which can be corrected, there is but one permissible conclusion it must be corrected. A state legislature has no more expertise than a court does in this area, and it is neither necessary nor proper to refer this case to the Michigan legislature so that it can give us its advisory opinion on these questions.
 
 
 66
 In fact, I think that the Michigan legislature is not the proper forum for the issues presented by this case. A proposal in the Michigan legislature to correct census figures would provoke a heated controversy, in which the citizens of Detroit and the citizens of other areas suffering high differential undercounting would be politically handicapped. Their strength and representation in the legislature is directly weakened by the very phenomenon at issue differential census undercounting. The net result of legislative consideration of this issue is likely to be a decision dictated by politics and not dictated by objective appraisal of the expert demographic testimony. It would probably be too much to expect state representatives from areas which have benefited politically from differential undercounting to in effect vote themselves out of office and increase the representation of the citizens of Detroit. The Supreme Court recognized this problem when it held in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), that the protection of the Constitutional right of equal representation could not be left solely to the legislatures. Because the vindication of this most important of Constitutional rights is a responsibility of the courts, I think we cannot put off a decision on the merits here.
 
 
 67
 Third, and finally, I think that failure to rule now will cause hardship to both parties and to the public interest. The issues presented by this case are too important. Avoiding these issues as the majority does will not make them go away. At the most, all that the majority opinion does is temporarily change the forum from federal court to the Michigan legislature. The Michigan legislature will then have to decide whether to adjust the census figures and, if so, by how much. Regardless of what decision the legislature reaches, someone will be unhappy with it. We can be assured that if the Michigan legislature fails to adjust the census figures, or adjusts the figures only slightly, that the plaintiffs will then return to federal court. But the majority is in error in its assumption that the litigation will end if the Michigan legislature grants relief to the plaintiffs and adjusts the census figures in a manner acceptable to them. If the Michigan legislature does make an undercount adjustment, it is certain that disgruntled voters and/or elected officials will promptly run to federal court and file a challenge to the adjustment. The stakes involved are high, and any adjustment must meet the standards outlined in Wesberry v. Sanders, supra, and its progeny. As a result, there is every incentive for affected persons, i. e. those residing in areas containing relatively few minorities, to challenge any adjustment.[10]
 
 
 68
 Thus it is clear that the issues presented by this case will require judicial resolution sooner or later. The majority prefers later. Unfortunately, this will cause great hardship to all concerned. If a federal court disagrees with the state's reapportionment determinations, the court will have to order reapportionment using the census figures it has determined are appropriate. The time, effort and money involved will be greater at that later date than now.
 
 
 69
 Given the political considerations discussed above, I think there is a significant risk that a court's undercount determination will differ from the Michigan legislature's. As I have said, if this happens there will be hardship to all concerned. Moreover, there will exist tremendous and unacceptable uncertainty regarding electoral boundaries until the undercount issue is resolved.
 
 
 70
 In sum, the issues presented are ripe and should be resolved now. It is unlikely that the Michigan legislature will change things or that its deliberations will be helpful to us. Most important, no matter what the Michigan legislature does, we will have to decide the issues presented by this case anyway. There is simply no reason to delay a decision on the merits. On the contrary, I think that it is the height of folly not to decide this case given both the importance of the issues and the problems engendered by postponing a decision.
 
 II.
 
 71
 As previously stated, the district court below ruled that the defendants must adjust their national, state, and sub-state census totals for 1980 to correct the differential undercounting of blacks and Hispanics. The court also ruled that the defendants could select at their discretion any available methods of adjustment "so long as they (the methods) are statistically defensible." These rulings are based on sound legal principles and are supported by the evidence at trial. However, new data released since the entry of judgment against the defendants leads me to the conclusion that the case should be remanded to the district court for further fact-finding, since this information was not available to the court at the time it reached its decision.
 
 A.
 
 72
 I think that the district court's formulation of the law governing this controversy is unassailable. Simply stated, the court held that the Secretary of Commerce and the Bureau of the Census are bound by the Constitution to conduct the decennial census as accurately as possible. This holding follows from the Supreme Court's recognition in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), of the constitutional right of equal representation that one citizen's vote should not weigh any more or less heavily than another citizen's vote. Later, the Supreme Court went on to hold that equal representation requires that the apportionment of representation in the United States House of Representatives and in the state legislatures must be based "as nearly as is practicable" on precise mathematical equality. See Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) and Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969).
 
 
 73
 It goes without saying that unless the population base for reapportionment is accurately determined, there can be no such precise mathematical equality between voting districts. If an inaccurate enumeration takes place, then some voting districts by virtue of differential undercounting would contain more persons than others.[11] In these circumstances, the deleterious effect on equality of representation might be as serious as any that would occur from gerrymandering. See Note, Demography and Distrust: Constitutional Issues and the Federal Census, 94 Harv.L.Rev. 841, 860 (1981).
 
 
 74
 Since the sole constitutional function of the decennial census is to provide a population base for reapportionment of Congressional districts,[12] the Census Bureau is bound by the Constitution to count people as accurately as possible.[13] Otherwise, the promise of Baker v. Carr would, in my opinion, be rendered a teasing illusion.
 
 B.
 
 75
 The district court found that the Secretary of Commerce and the Census Bureau did not conduct the 1980 census as accurately as possible since they did not adjust the final tally to correct for the differential undercounting of blacks and Hispanics. The court found persuasive the plaintiffs' expert testimony which established that there has been a perennial differential undercounting of blacks and Hispanics. In fact, testimony by Dr. Philip M. Hauser, University of Chicago Professor of Urban Sociology and former Acting Director of the U. S. Census Bureau, established that under the original Constitution "the slaves (in 1790 were) ... counted as three-fifths of a person, but (now almost 200 years later) the black male twenty-eight years of age counts as 78 per cent of a person."[14] The district court also found that the extent and nature of this differential undercounting could be accurately determined,[15] and that the state of the statistical art allowed the Census Bureau to impute into the final census tally the number of persons missed during the headcount.[16] According to the testimony, statistical adjustment would yield a more accurate estimate of the number of persons within the United States than would result from current Bureau counting procedures.[17]
 
 
 76
 Because the trial occurred before release of preliminary 1980 census data, the expert witnesses below based their testimony on data derived from past censuses and from projections of 1980 census results.[18] The parties did stipulate that there would be an undercounting of persons within the United States in 1980, and that the Bureau would undercount blacks and Hispanics at a higher rate than whites.[19] However, there was no stipulation as to the rate of this differential undercounting for 1980.
 
 
 77
 The only way to determine actual differential undercounts is to compare the census headcount with demographic estimates of the nation's true population. As the majority notes, the Census Bureau argues on appeal that it cannot determine the actual differential undercount for 1980 because of the presence of large numbers of illegal aliens within the United States. Preliminary 1980 census figures released after the trial below show that the Bureau has counted approximately 226 million people. Since earlier demographic studies indicated that about 226 million people would be within the United States on April 1, 1980, the preliminary census data on the 1980 headcount substantially equals the available demographic estimates.[20] Thus, the defendants assert that no statistical adjustment of the 1980 headcount is possible since there are no available means to measure how many illegal aliens have been counted. They conclude that there is no way to determine how many blacks and Hispanics were missed in the 1980 headcount.
 
 
 78
 In its recitation of the facts, the majority seems to accept the Bureau's analysis as true.[21] However, the plaintiffs have not had an opportunity to rebut the Census Bureau's analysis since the plaintiffs' experts testified before the release of the preliminary 1980 census data. It is for this reason that I would remand this case to the district court for further fact-finding. If the plaintiffs can show that there are available methods to measure the differential undercounting of blacks and Hispanics, then the district court's conclusion is correct statistical adjustment to correct the differential undercounting is feasible. I think the plaintiffs should have this opportunity. They should be allowed to submit additional evidence on remand, particularly in view of the evidence introduced in Carey v. Klutznick, 508 F.Supp. 420 (S.D.N.Y.1980) which indicates that there may be ways to accurately measure the 1980 undercount.[22]
 
 
 79
 Accordingly, I would remand this case to the district court.
 
 
 
 [1]
 Article I, Section 2, Clause 3 of the original Constitution provides:
 Representatives ... shall be apportioned among the several States ... according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons ... and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.
 The provision of the original Constitution providing for Congressional representation based on three-fifths of the slave population was removed by the first sentence of Section 2 of the Fourteenth Amendment:
 Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.
 
 
 [2]
 The statutory construction issue arises from the language of 13 U.S.C. § 195 (1976):
 Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as "sampling" in carrying out the provisions of this title.
 
 
 [3]
 April 1, 1980, is the decennial census date for the 1980 census. The Census Act provides:
 The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States.
 13 U.S.C. § 141(b) (1976).
 Section 141(c) provides in part "(B)asic tabulation of population of each other State, shall, in any event, be completed, reported and transmitted to each respective State within one year after the decennial census date."
 
 
 [4]
 Many factors account for the fact that some individuals are more difficult to count than others: attitudes toward government, visibility, and stability are personal characteristics which vary among regions and among different groups depending on age, sex, income, literacy, immigration status, employment, race and other cultural and religious traditions which mold living styles and environment. Non-personal factors such as climate, census procedures, house design and distance between homes also contribute
 
 
 [5]
 It is estimated that approximately one-third of the nation's approximately 25 million blacks fall below the income-based poverty line, but the estimated figure for whites as a group is much smaller
 
 
 [6]
 These studies were completed three years after taking the census. For purposes of this case it is not important to explain in detail the survey methods on which this estimated undercount is based. It is sufficient to note that experts seem to agree that "demographic analysis" provides the most reliable testing procedure. Under this method the demographer tests the census by using the age, sex and race breakdowns from previous censuses supplemented by other data for example, birth and death registrations and medicare records. The Census Bureau also uses reinterview surveys and samples in order statistically to project standard rates of deviation and error
 
 
 [7]
 See footnote 2, supra
 
 
 [8]
 A secondary standing consideration is related to the question of remedy. Although this relationship has never been well-defined, either before or after the changes in the standing doctrine defined in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), see Vining, Legal Identity 26 (1978), standing does still depend on the existence of a situation where "the exercise of the Court's remedial powers would redress the claimed injuries." Duke Power Co., supra, 438 U.S. at 73, 98 S.Ct. at 2630. Obviously there are many unjust conditions and occurrences, natural and man-made, which federal courts do not have the strength, wisdom or power to remedy in a timely manner. When there is no realistic remedy available, there is no point in deciding the merits. In light of our disposition of the justiciability issue based on other considerations, we need not decide whether the only remedy available the synthetic method is so unrealistic that it defeats standing to litigate the case on the merits
 
 
 [1]
 In his opinion for the majority, Judge Merritt makes a number of statements in dicta which have no support in the record. Specifically, the majority states:
 No claim is made that upper and middle class blacks and hispanics are undercounted in comparison with whites of the same economic class. Rather, plaintiffs have demonstrated the undeniable fact that for a complex set of reasons it is more difficult to count the poor and the uneducated whether black or white, than the middle class and the well-to-do. Plaintiffs rely on Census Bureau studies of previous census figures that show that as a group, more blacks are missed than whites because as a group, blacks are more disadvantaged. Plaintiffs' key witness, Dr. Philip M. Hauser, a former director of the Census Bureau and chairman of the University of Chicago Sociology Department, stated the basic reason for previous undercounts of the black population: "It is not a question of color; it is not the difference in color that makes them hard to count. It is that whole cluster of characteristics associated with color which stands as a proxy for this cluster of characteristics." (citations omitted)
 Proceeding from this premise, the majority goes on to conclude that a synthetic adjustment technique might be unfair:
 The major portion of an estimated 1,000,000 black undercount (approximately 4%) apparently comes from the approximately 30% of the black population at or below the poverty line because they are hard to count. Yet the synthetic method would add 70% of the black undercount to the voting strength of the more advantaged group, the black middle class. As in the case of whites, distribution of the black undercount according to the synthetic method has the effect of taking voting strength from the disadvantaged black population and giving it disproportionately to the more advantaged members of the same class.
 The majority opinion presents an amusing sociological analysis. It would be nice if the court's views had some support in the record. Unfortunately, they do not.
 All of the expert witnesses agreed that there is an undercount and that no census can count everyone. As the tables reproduced in the majority opinion show, the undercount varies according to three major variables: age, sex and race. In terms of electoral voting power, the significant variable is, of course, race. Dr. Carl Taeuber's undisputed testimony below established that the black community of this country is concentrated in urban areas. Thus, a disproportionate racial undercount, combined with geographical concentration of blacks, results in underrepresentation of those areas with concentrated black populations.
 As noted above, the majority claims that the racial variable in census undercounts is a myth. According to the majority, the racial variable is really an economic variable; it is poor people who are undercounted. The only reason blacks are undercounted more than whites, according to the majority, is that blacks are poorer than whites.
 The record contradicts these bald assertions. Dr. Hauser did state that the lower socioeconomic status of blacks was "the most important factor in the undercount that is measured by race." (App. at 421). However, he stated that the undercount was "due to a number of factors." (App. at 402). Dr. Hauser's testimony was well summarized in Judge Gilmore's opinion below:
 Extensive expert testimony as to the underlying causes of the differential undercount was taken. Although the precise weight to be attributed to the various factors involved is not known, all of the experts agreed that some or all of the cluster characteristics associated with race are major factors. In this regard, Dr. Philip M. Hauser, a witness for the plaintiffs, stated that the following characteristics should be considered important:
 
 
 [1]
 lower income leading to diverse and unique housing patterns and living arrangements which frequently involve the lawful or unlawful conversion of housing units to accommodate increased numbers of people;
 
 
 [2]
 greater antagonism or resistance to government;
 
 
 [3]
 relatively less education; and
 
 
 [4]
 increased numbers of individuals within the harder-to-enumerate categories, such as young males
 
 
 [497]
 F.Supp. at 1327-28
 Examination of Dr. Hauser's testimony reveals that race is indeed the critical factor in gauging an undercount. All that Dr. Hauser is saying in the passage quoted by the majority is that the combination of the factors of poverty, alienation, less education, and youth correlate with race and it is these factors which explain why there is an identifiable racially differential undercount of blacks and Hispanics. This is clear upon examination in context of Dr. Hauser's testimony quoted by the majority:
 Remember this, a third of all blacks live in poverty by the government standards. Twenty-seven per cent of Hispanics live in poverty by government standards. The combination of their socioeconomic status, residences which are often of substandard quality, hard to locate, residential patterns of occupancy which make it very difficult to find separate households within cramped quarters, converted structures, some legally converted, some illegally converted, that the socioeconomic status of our minority groups is such that by reason of that status and other research by the Bureau tends to support this, that they are difficult to count. It is not certainly a question of color, it is not the difference in color that makes them hard to count. It is that whole cluster of characteristics associated with color which stand as a proxy for this cluster of characteristics. Are these characteristics that result from a history of prior discrimination against minority groups in this country? Well, that is certainly clear, yes.
 App. at 404-05
 In fact, Dr. Hauser's position became crystal clear in later testimony:
 (C)ertainly no one is going to argue that the reason for the differential and undercount is traceable by the color of the skin or the ethnic origin. The reason for the undercount is traceable to the whole cluster of characteristics of these people for whom the designation of race or origin is a proxy. Now it turns out, as census statistics make quite clear, that these two populations are socially and economically greatly disadvantaged when compared with whites. They have lower education, they have much lower income, they live in much larger proportions of substandard dwellings, there are much larger proportions of people living in poverty, as measured by government standards itself. They are highly concentrated and segregated within the inner cities of metropolitan United States as my colleague, Dr. Taeuber, will be indicating in greater detail later. Now these clusters of characteristics that characterize respectively the black and the Hispanic populations are pretty uniformly distributed through the black and Hispanic populations in the areas in which they are predominantly concentrated, the inner cities of our large metropolitan areas. And so, if you make these adjustments, you are very definitely I think correcting what amounts to be the most grievous aspects of census undercount.
 App. at 432-33 (emphasis added).
 Additional support comes from Dr. Carl Taeuber's testimony:
 The estimate of a substantial black undercount has been made for each census, going back to this period when blacks were very heavily rural and southern. As blacks have moved to the cities and to the North, this differential undercount has persisted. This is a kind of historical suggestion that it's not simply because the blacks were rural or because Hispanics were migrant laborers. The undercount persists even as these populations have become heavily metropolitan. Now in fact, for the recent censuses, particularly for 1970 and from what we know already of what the 1980 results will show, we know that the blacks and Hispanics are still subject to a considerable amount of housing discrimination and job discrimination, which tends to help produce these concentrations, the residential segregation, which means that the middle class members of these groups as well as the working class, the poorer members, all tend to live predominantly in these ghettos or barrios. They are not widely dispersed by social class in the same degree that the white population is. We know that within these concentrated minority areas there is a very low social and economic status. There are many broken families, there is a very high rate of residential mobility, people moving from one rental unit to another, there are many unusual household and living arrangements, relatives, boarders, and the like. There is within these populations a fairly high degree of antagonism toward government, as represented in some of the riots we have recently had, as represented in a lot of the concerns say in the Hispanic community about problems of deportation, concern with the legal status of the people in relation to the government, fear of cooperation with the census and other government agencies. Now this would suggest that we should get that the circumstances are generally similar from one ghetto to another, that the general features which may produce the undercount, as I must say we don't know exactly what those features are, we do know that many blacks and many Hispanics are missed, but we don't know exactly why. Now something in this cluster of attributes may be pertinent, and I think it has a lot to do simply with minority status rather than simply living arrangements because the Bureau, not just in 1980, the Bureau of the Census also for 1970, for which we do have major undercount status, did make major efforts to enumerate, did have special campaigns and the like, was aware of the problem ahead of the census, did the best they could and still came up with a substantial differential undercount. Now if every one of those ghettos and barrios is expected to have a substantial undercount, then the application of the synthetic method fits the criteria that there is a high degree of similarity within each of the concentrations, so that assuming that the national rate applies to each one of these areas, is a reasonable assumption, it is a very plausible assumption. Q. Now let us assume that we know that at the national level then blacks are undercounted at a rate of 8 per cent and whites at a rate of 2 per cent. Let us also assume that Hispanics are undercounted at a rate of 8 per cent compared to non-Hispanics at a rate of 2 per cent, the same four to one differential. In your opinion then, would an adjustment of the black and Hispanic population of each state and sub-state area by 8 per cent and an adjustment of the white non-Hispanic population by 2 per cent get us closer to the truth than the raw unadjusted census data?
 A Yes, it would.
 App. at 623-27 (emphasis added).
 The majority baldly asserts that "no claim is made that upper and middle class blacks and hispanics are undercounted in comparison with whites of the same economic class." Dr. Taeuber's testimony refutes this assertion:
 Q And was it the thrust of your testimony that from a sociological and demographic perspective, there is no reason to believe that the undercount rate of blacks and Hispanics varies significantly from one place to another?
 A Yes, that was the thrust of it ...
 The above testimony refutes the majority's simplistic suggestion that undercounts are class-based and not race-based that the few blacks or Hispanics in the suburbs are undercounted to a significantly lower degree than their counterparts in other areas. In fact, no authority that I have seen or heard of makes that suggestion. Under these circumstances, I can only wonder whether the author of the majority opinion read the same record that I did.
 
 
 [2]
 See Note, The Supreme Court, 1975 Term, 90 Harv.L.Rev. 54, 212 (1976); L. Tribe, American Constitutional Law 93 (1978). See also Lewis, Constitutional Rights and the Misuse of Standing, 14 Stan.L.Rev. 433, 439 n.22 (1962) (relying upon standing doctrine "may lead to a shorter, more easily written opinion, but it will also lead to inadequate consideration of the real issue or conceal the actual thought process which produced the result.")
 
 
 [3]
 Causation analysis exists in areas of the law other than torts and standing. Although the analysis may be phrased in different ways when it appears in different areas of the law, upon closer examination causation can only be viewed in terms of either "but for" cause or proximate cause wherever it appears. For example, causation in the substantive criminal law and in criminal procedure takes the form of either "but for" or proximate cause depending on the circumstances. See 7 Wharton's Criminal Law § 193-211 (1974) (discussing the causal connection between offender and offense). See also United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); United States v. Ceccolini, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (cases applying the "fruit of the poisonous tree doctrine" under the Fourth Amendment's exclusionary rule)
 Since these two principles proximate and "but for" cause represent the only available modes of causation analysis in the law, it is reasonable to expect the Supreme Court to adopt them as it provides further explication of the second prong of the injury-in-fact constitutional standing requirement. Since it would be unreasonable to expect the Court to invent new causation principles which would operate solely in the law of standing, the tort causation analogies relied upon in this dissent should control here.
 
 
 [4]
 A "refined" variation of "but for" causation is the substantial factor theory. Under this approach, a defendant's conduct is a cause of an event if it is "a material element and a substantial factor in bringing it about." Prosser, supra at 240. However, even under this variation of "but for" causation a defendant "will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present. In particular, however, a defendant is not necessarily relieved of liability because the negligence of another person is also a contributing cause and that person, too, is to be held liable." Id. at 240-41
 
 
 [5]
 The Supreme Court has not specifically decided which of these forms of causation analysis governs the second prong of the injury-in-fact standing requirement. See Note, The Causal Nexus: What Must be Shown to Sue in Federal Courts, 29 Univ. Florida L.Rev. 250, 256 (1977). It is clear, however, that a causation requirement for standing purposes which is more strict than that required in the tort law is impermissible. See note 3 supra. In fact,
 "unlike tort cases, standing questions do not involve the liability of a private defendant for the consequences of his actions, but instead are concerned with the individual's rights to obtain a judicial forum to protect himself from injurious government action. Since it is a threshold determination, the standing test should not be as strict as that which must be met on the merits. Instead the courts should be satisfied with a demonstration of a reasonable possibility of a causal relationship. Id. at 257-8 (footnotes omitted) (emphasis added).
 The Supreme Court has implicitly recognized this principle. In Duke Power Co. v. Carolina Environmental Study Group, supra, 438 U.S. at 75 n.20, 98 S.Ct. at 2631 n.20, the Court expressed the "but for" causation standard for standing purposes in the following terms: Whether "there is a 'substantial likelihood' that the relief requested will redress the injury claimed." (citations omitted). In other words, if there is a "substantial likelihood" that an injury would not occur without the challenged conduct, standing causation exists. See id. at 74, 98 S.Ct. at 2630. This formulation is less strict than the tort "but for" cause standard. In torts, substantial likelihood will not suffice; a plaintiff must show that its injury absolutely would not occur "but for" the allegedly tortious conduct.
 I think that a showing of "a reasonable possibility of a causal relationship" and more was made below. Therefore, I believe that the second prong of the injury-in-fact requirement was met, and that the plaintiffs have the required standing to bring this action.
 
 
 [6]
 The direct cause or most "immediate cause" of the plaintiffs' claimed injury is concededly the decision of the Michigan legislature to use unadjusted federal census figures for state reapportionment. But this does not mean that the Bureau's actions are not also a cause of the injury. Although Lord Bacon stated that the common law "contenteth itself with the immediate cause; and judgeth of acts by that, without looking to any further degree", Smith Legal Cause in Actions of Tort, 25 Harv.L.Rev. 103, 106 (1911) that has long ceased being the case. See Prosser, supra at 246
 The decision of the Michigan legislature to use federal census figures is an act which occurs between the time that the Bureau supplies unadjusted figures and the time of plaintiffs' injury. Therefore, the Bureau's act is an indirect cause. But under tort law this alone would not eliminate the Bureau's actions as a cause. If this is not the result in tort law then surely it cannot be the result in the law of standing. See note 4 supra.
 
 
 [7]
 The government points out that Hawaii apparently does not use federally supplied sub-state totals for state reapportionment. See Reply Brief For the Appellants at 5 n.7 (citing Congressional Districts in the 1970's, Congressional Quarterly 1973 at 51). However, there is no question that this is a very unusual state practice. See Note, Demography and District: Constitutional Issues of the Federal Census, 94 Harv.L.Rev. 841, 861 (1981) ("in practice, most states will probably use unadjusted figures, if those are the data supplied by the Census Bureau."). It is so unusual that the Bureau must expect and be able to foresee that in almost every instance its sub-state totals will in fact be used by the states for reapportionment
 
 
 [8]
 M.S.A. § 2.212(22), M.C.L.A. § 8.3v reads as follows:
 The population of the state or any political division thereof shall be determined, unless otherwise specifically provided, on the basis of the latest federal decennial census preceding the time as of which the population is to be determined.
 
 
 [9]
 See Note, The Supreme Court, 1975 Term, supra, 90 Harv.L.Rev. at 209 n.31 ("The Court states that a federal court cannot act to 'redress ... injury that results from the independent action of some third party ...' To the extent that this implies that plaintiffs must prove that defendants' actions were the sole cause of plaintiffs' injury, it is certainly an incorrect view of causation as an element of a cause of action.") (citations omitted)
 Should the Court decide to adopt an intervening cause formula for standing, it is reasonable to expect that this formula will conform with pre-existing notions of intervening cause. See text accompanying note 5.
 
 
 [10]
 The situation here is analogous to that presented by a voluntary affirmative action plan. Before the Supreme Court's decision in United Steelworkers v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), an employer faced an impossible dilemma if it considered an affirmative action plan to remedy its possible past discrimination. If it failed to remedy past discrimination, it might face lawsuits from minority employees who might have been discriminated against. However, if the company initiated an affirmative action plan, it might face lawsuits from white workers. See Weber v. Kaiser Aluminum Co., 563 F.2d 216, 227-39 (5th Cir. 1977). (Wisdom, J., dissenting). In order to help solve the employer's dilemma, the Supreme Court in Weber established a zone of reasonableness. See DPOA v. Young, 608 F.2d 671 (6th Cir. 1979) cert. pending
 Unfortunately, there is no Weber decision in the reapportionment area. As employers have faced discrimination and "reverse discrimination" lawsuits, so state legislatures will face reapportionment and "reverse reapportionment" lawsuits.
 
 
 [11]
 If the Bureau undercounted segments of the population in an equal fashion, then census undercounting would create no equal representation problem. Each voting district would be undercounted to the same degree, and the relative strength of each citizen's vote would be unaffected by the undercount. The differential undercounting alleged here, on the other hand, dilutes the strength of those citizens who reside within voting districts with higher numbers of blacks and Hispanics since the elected representatives of these districts actually represent more people than do the elected officials of other districts
 
 
 [12]
 Article I, Section 2, Clause 3 of the Constitution provides:
 Representatives ... shall be apportioned among the several States ... according to their respective numbers ... The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.
 
 
 [13]
 The Constitution requires the Secretary of Commerce and the Census Bureau to supply accurate national and state census figures. It does not require the Secretary or the Bureau to supply sub-state totals to the states for reapportionment of Congressional districts within the state. However, 13 U.S.C. § 141(c) requires the Bureau to do so. Since national and state totals are compiled by adding up sub-state census totals, it is obvious that the state or national census figures can be no more accurate than the local figures. Thus, the Bureau is necessarily bound by the Constitution to make its sub-state population totals as accurate as possible. It is bound by the statute to distribute these "accurate" figures to the states
 In addition, since "one man, one vote" is the law of the land, an accurate population base for reapportionment is necessary. The Census Bureau in virtually every case provides the data base for reapportionment. Thus, I believe that Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and its progeny provide additional direct support for the Bureau's duty to provide accurate census figures.
 
 
 [14]
 As the majority notes, the Bureau estimates that it undercounted 7.7% of the blacks in 1970 and only 1.9% of the whites. But significant differential undercounting of black people has occurred throughout the history of the federal census. See R. Hill, The Synthetic Method: Its Feasibility for Deriving the Census Undercount for States and Local Areas (paper prepared for the Conference on Census Undercount, Feb. 25-6, 1980) reprinted in Appendix, at 1628. In 1870, 9.5% of blacks were uncounted, while 1.9% of the white population was not counted. Estimates for that year indicated that 41.9% of all the persons uncounted that year were black. Id. in 1920, 1930, and 1940 blacks were undercounted at the rate of 15.2%, 12.5% and 12.7% respectively. The white undercount, on the other hand, ranged from about one to less than three percent during those years. H. Alterman, Counting People: The Census In History 279 (1969). In 1950 and 1960 the black undercount was much greater than the undercounting of whites. Id. at 80-81
 Hispanics have experienced a similar history of differential undercounting in the federal census. Exact figures on the nature and extent of this undercounting in past censuses are not available, but the government does not dispute the fact that significant undercounting has occurred. The district court found that "almost as large a percentage of Hispanics have been undercounted" as blacks. 497 F.Supp. at 1318.
 The expert testimony below established that a long history of faulty census questionnaires, language difficulties, as well as poverty, antagonism, lower education, and demographics have led to significant differential undercounting in the Hispanic community. See note 1 supra.
 
 
 [15]
 The plaintiffs' expert witnesses testified that because the "cluster of characteristics" in the nation's black community has not dramatically changed since 1970 the rate that blacks are differentially undercounted should not change much, either. On direct examination, Dr. Hauser testified as follows:
 Q. Dr. Hauser, if in 1970 we had an undercount of 2.5 per cent, then why do we have an undercount of this magnitude?
 A. I think the answer is complex. It is due to a number of factors, including the following. One, we have a very large nation with over 3,000,000 square miles with very uneven distribution of population by a region, difficult to find. Second, and probably even more important, we have had tremendous differences in the social and economic status of our citizens and especially members of minority groups. This would include the blacks, Hispanics, and other groups. Blacks and Hispanics are the largest of this minority group. Third, we have had the factor of leadership, public opinion makers, including Congressmen, Senators, candidates for the President, all of whom generate attitudes that affect the citizen in his relationship to his government. And fourth, you have the citizen himself in a country such as ours where in an unparalleled fashion every citizen has the right to tell his government to go to hell, and many exercise that right, and particularly under the influence of a leadership which encourages this attitude. Now it is the interaction of all these factors, plus one other, to which I have referred in a specific instance. The changing composition of the population. If there is an increase in the proportion of the population that is most difficult to count completely, then there is an increase in the undercount.
 Q. Is that situation occurring for 1980?
 A. In 1980 these factors are all operative. The interaction and net effect of these is still to be determined. There are a number of factors that, all other things being equal, would tend to decrease the undercount, but there are also a number of factors operating which would tend to decrease [sic] the undercount and the net effect of this is not known to anybody at this time. App. 402-3.
 Regarding the Hispanic population, Dr. Hauser testified as follows:
 Q. You have explained how, through matching studies, it would be possible to obtain an estimation of the Hispanic undercount at the national level?
 A. Yes.
 Q. Assuming that the Census Bureau was unable to complete matching studies to determine the Hispanic undercount, but did have the black undercount through demographic analysis, in your opinion would it be reasonable to assume that the Hispanic undercount was substantially the same as the black undercount?
 A. Well, if you had nothing else to go by, this is one judgment that could bring the statistics closer to the truth than the unadjusted data. In my judgment, yes.
 Q. Would it also be reasonable, in light of what you have said, to assume that the Hispanic undercount was intermediate between white and black, but closer to black?
 A. That is another judgment, as to between these judgments, nobody would have a definitive answer as to which was the better judgment.
 Q. In your opinion, from a demographic standpoint, would either judgment be a reasonable one?
 A. Well, in light of what we know about the characteristics of the predominant proportion of the population of Hispanic origin, I would say either judgment would have some justification and some reason, and either one could conceivably bring the number closer to the truth than the unadjusted data. App. at 418-20.
 Dr. Hauser testified that in his expert opinion the recent coverage improvement initiatives of the Census Bureau would create no net improvement in the differential undercount rate:
 Q. By factors that would tend to increase the undercount, are you referring to the coverage improvement plans of the Bureau?
 A. Well, factors this would tend to decrease the undercount.
 Q. Decrease the undercount?
 A. Decrease the undercount. The Bureau has spent more money and procedures to try to minimize the undercount at this time than in any previous census. These would tend, if successful, would decrease the size of the undercount.
 Q. I believe you indicated earlier that because of demographic considerations, there are, in other words, approximately 2,000,000 people likely to be undercounted if there is no improvement in coverage?
 A. About an extra million or more by reason of just the increased proportions of blacks and increased proportion of hard-to-find youth, who are there because of the post-war baby boom.
 Q. So that in lieu of that, is it possible that the coverage improvement features will be offset by this and so will not have any net effect?
 A. Well, this and other factors of the type to which I referred. Remember this, a third of all blacks live in poverty by the government standards. Twenty-seven per cent of Hispanics live in poverty by government standards. The combination of their socioeconomic status, residences which are often of substandard quality, hard to locate, residential patterns of occupancy which make it very difficult to find separate households within cramped quarters, converted structures, some legally converted, some illegally converted, that the socioeconomic station of our minority groups is such that by reason of that status and other research by the Bureau tends to support this, that they are difficult to count. App. 403-5.
 
 
 [16]
 See, e. g., the testimony of Dr. Robert Hill, App. 507-10; the testimony of Dr. Taeuber, App. 631-2; and the testimony of Dr. Hauser, App. 424-5, 444-5
 
 
 [17]
 For example, Dr. Hill testified in part as follows:
 Q. Sir, do you have an opinion as to whether or not an adjustment of the 1980 Decennial Census to include the undercount would permit population totals based on the techniques that are available to the mathematical and statistical and demographic communities to arrive at population, corrected population totals, that are closer to the truth than the numbers that would be obtained from the counts?
 A. I do have an opinion.
 Q. What is that opinion, sir?
 A. I do believe that the population estimate as derived by the demographic procedure at the national level will yield more accurate count of the population than will be derived by the enumeration procedures of the Census Bureau.
 Q. Do you have an opinion as to whether there are techniques to distribute that undercount from the national level into the local areas so that the local areas which have population counts that are corrected would have counts that would be closer to the truth when comparing to those population counts that were not corrected?
 A. Yes, I do have an opinion.
 Q. What is that, sir?
 A. I believe that, first of all, in terms of the state of the art at this time, that the demographic analysis yields the most accurate measure of the undercount at the national level. By utilizing the synthetic method for deriving estimates of the undercount for states, I think it is an extremely reliable procedure for deriving estimates of the undercount for states, so that by taking what I did from the Census Bureau demographic estimates at the national level, one can then derive reliable estimates of the undercount for states.
 Q. How about below the state level?
 A. Well, now here I think that there are several options that are available. One is that I also believe that one can derive reliable estimates below the state level, but clearly demographic analysis tells us several things. One is that there is an inverse relationship with reliability and size of place, so that we would expect that the smaller the area, we will have greater error in the estimates that we are deriving. But I think for many large metropolitan areas you could use the synthetic method for being able to derive those. So I think that it can be used. There is another procedure which is what the Census Bureau has been using, which I think is a viable option, and it was particularly used in their [sic] where you counted procedures, where what you have in effect, if you take the state totals that are derived by the synthetic method, you can therefore, according to the procedures that they use and when you count it, you have a number of
 Q. (Interposing) Where you counted?
 A. Where you counted, the similar procedure, the imputation procedures they used for those.
 Q. In 1970?
 Q. Do you have an opinion, if they used a synthetic method, taking the national undercount rates by race and applied the synthetic method from down to the national level and to local areas to the degree that they have to report to the state on April 1st of 1981 for Congressional apportionment purposes that those numbers, just using a synthetic method alone, whether or not the corrected totals for the undercount would be on the average closer to the truth than the population totals that were not corrected?
 A. I do have an opinion.
 Q. And what is that?
 A. It is that those estimates would be closer to the truth than unadjusted population counts for areas on the average.
 Q. Would that be true for a significant proportion of the areas that were adjusted?
 A. Yes, it would be true for the significant proportion of the areas that were adjusted.
 Q. Would there be areas where there is a possibility that an adjustment for undercounts in some percentage slightly less accurate than the unadjusted population counts?
 A. I would think that there would be, but I think that there would be a very small minority.
 Q. Now with regard to using the synthetic method just for distributing population down to the local levels for apportionment purposes, with regard to the relative proportions, do you have an opinion as to the degree of reliability that would grow out of that type of an undercount adjustment?
 A. Yes, I do have an opinion.
 Q. What is that?
 A. I think the real virtue, frankly, of the synthetic method is that in addition to giving you reliable estimates in an absolute sense, it is even much more powerful in giving you reliable relative proportions of the count relative places in relation to each other which is the basis for apportionment.
 Q. Explain to the Court what you mean by relative apportionment?
 A. What I mean is the synthetic method would give you some estimates for areas. Now the real significance is not in some cases what those may be in their absolute numbers, although that is part of what you would derive, but even more significant is that you would consistently get estimates that were in the proper ordinal relationship to each other, that those places that in many cases we suspect would tend to have higher undercount rates because of these factors that we are talking about, would, by repeated different measures, would yield estimates higher than those that one would tend to have less of those characteristics, so that you would be able to distribute your entire population for a state in very reliable terms for any boundary distribution or what have you using the synthetic method.
 
 
 [18]
 The original complaint in this case was filed on Census Day, April 1, 1980. Testimony was heard during August of 1980, and the district court opinion and judgment for the plaintiffs was issued on September 25, 1980. The release of significant amounts of data concerning the actual 1980 population count was not available until later. However, by October 27, 1980, preliminary field count figures were available for areas where 95 percent of the U. S. population resides. See Report Of The United States Bureau Of The Census To The Judgment Of The Court 2 reprinted in Appendix at 122
 
 
 [19]
 The relevant stipulation reads as follows:
 The parties hereby stipulate the following facts are true:
 A. In the taking of the 1980 decennial census, there will be a census undercount, in that all of the persons actually residing in the United States on the census date, April 1, 1980, will not be enumerated as part of the 1980 decennial census.
 B. In the taking of the 1980 decennial census, it is likely that there will be a differential of completeness for blacks and Hispanics when compared to whites.
 Final Pre-trial Order, para. 3, at 3, reprinted in Appendix at 61.
 
 
 [20]
 At the time the Bureau filed its Post-Trial Report, its preliminary field count for the nation as a whole showed 225,590,000. By then, it was "increasingly confident that the final (head)count (would) ... exceed 225 million and approach 226 million." Pre-censual estimates of the actual 1980 population projected that about 221,672,000 persons would be within the country at that time. Post-Trial Report, at Appendix 129-33. This latter figure contained no "allowance for undernumeration in the previous Census." Id. at 130
 
 
 [21]
 I am surprised by how apparently willing the majority is to accept the Bureau's ex parte post-trial analysis. This stands in sharp contrast to the majority's silence regarding the district court's findings of fact after trial. The district court's findings are supported by substantial evidence and are not clearly erroneous. In fact, the government has never challenged the district court's findings on appeal. The government's main brief argued only that 1) the plaintiffs lacked standing, 2) the Bureau's decision to base the census on an actual enumeration was rational and not arbitrary, and 3) the district court abused its discretion in ordering injunctive relief. In its reply brief, the government, while arguing that no statistically defensible adjustment method exists, takes a curious position. It states:
 In addition, at a number of places in their brief, plaintiffs claim that we cannot or do not dispute the findings made by the district court. As noted in our introduction, this claim is false. As we show below, the district court never should have reached these factual conclusions in the first place. Consequently, we attack them by demonstrating that the record proves that the Census Bureau conducted the census in a rational manner. Therefore, it is unnecessary for the Government to argue that the findings were clearly erroneous. Gov't Reply Brief at 14-15.
 As I note, I do not think that the district court applied an incorrect legal standard. Even if it did, however, the underlying factual findings are still subject to the clearly erroneous rule. Accordingly, the government's attacks on the feasibility of adjustment must be tested under this rule. It is disingenious for the government to snipe at the district court's findings while claiming that it does not have to challenge them as clearly erroneous.
 
 
 [22]
 Evidence introduced in the Carey v. Klutznick trial apparently contradicts the Bureau's conclusion that there are no available methods to measure the 1980 undercount. The trial court found:
 While the "measured undercount" for the nation has been reduced to almost zero by the latest estimates, the Census Bureau has no evidence that there has been a decrease in the differential undercoverage of the groups that traditionally are "hard to enumerate." There is, however, evidence from independent surveys that the populations of New York State and New York City which contain relatively large numbers of the "hard to enumerate" were undercounted in 1980 in differentially high proportions to that of the nation as a whole.
 Conservative estimates of the undercount in 1980 for New York City ranged from 517,000 to 650,000 and for New York State ranged from 772,000 to 905,000. Plaintiff's Ex. 235 at P 19. The results of a random phone survey of New York City and New York State residents conducted between August 20, 1980 and September 11, 1980 by the independent public affairs research organization, Penn & Schoen, indicate that 6% of the population of New York State and 8% of the population of New York City have not been counted by the Census Bureau. While the defendants have challenged the reliability of this survey I find that it is entitled to some weight in demonstrating the magnitude of the undercount in New York.
 Other evidence of the undercount in New York are the results of "Were You Counted Campaigns" in New York City and Rochester. The results of the New York City "Were You Counted" campaigns show that 18,109 or 11.2% of the 161,718 applicants or recipients interviewed by 41 Income Maintenance Centers, 8 recertification offices and 16 non-public assistance Food Stamp Offices of the New York City Human Resources Administration had not been counted. A mail survey conducted of all 302,000 households in the New York City Income Maintenance Program indicated that of the 281,130 households that responded, 217,325 stated that they had returned a census form or were visited by a census taker, 41,175 did not answer the question and 22,270 or 8% of the respondents stated that they did not return a census form or were not visited by a census enumerator.
 Defendant's have submitted a preliminary report on the processing of "Were You Counted" forms for New York City. The results indicate that 9,796 or approximately two-thirds of the 15,158 individuals who claimed they were not counted lived in households from which the Census Bureau had already received a mail questionnaire or a field return questionnaire showing an equal or greater number of persons. Of the remaining one-third or 5,362 persons, 83.04 percent of the individuals contacted by the Census Bureau were found to have been missed by the census. Of 2,123 persons contacted by the Bureau 1,763 were added to existing census figures. If the 3,239 individuals who were not contacted by the Census Bureau are deemed to have been missed at the same rate as persons already reached by the Bureau, this would result in the addition of 2,688 (83% of 3,239) individuals to existing census counts. The total figures would then reveal that of 15,158 individuals who claimed they had not been counted, 4,451 or 29.4% were in fact not counted. Of course, many more individuals have submitted "Were You Counted" forms in New York City and approximately 30 percent of that population were most likely missed by the Bureau.
 In the City of Rochester "Were You Counted Campaign," 7 to 10 percent of those contacted stated that they had not been enumerated. Of those who claimed they had been missed by the Census Bureau, approximately 60% were verified by the Census Bureau as not having been enumerated. 508 F.Supp. 420, 428.