UNITED STEELWORKERS OF AMERICA, LOCAL 2116, Russell Whisman, Darrell Tucker, G.R. Jones, and David Jewell, Plaintiffs–Appellants,

v.

CYCLOPS CORPORATION, Defendant–Appellee.

No. 87–3191.

United States Court of Appeals, Sixth Circuit.

Argued March 1, 1988.

Decided Oct. 25, 1988.

William K. Shaw, Jr. (argued), Portsmouth, Ohio, for plaintiffs-appellants.

Daniel O. Berger, Cincinnati, Ohio, Stephen C. Kunkle (argued), Pittsburgh, Pa., for defendant-appellee.

Before ENGEL, Chief Judge *, and MERRITT and KRUPANSKY, Circuit Judges.

ENGEL, Chief Judge.

Plaintiffs appeal the denial by the United States District Court for the Southern District of Ohio, Western Division, of their

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

motion for summary judgment and the granting of defendant's motion for summary judgment in this action involving a pension plan funding dispute between the parties. Plaintiffs allege that the district court erred in finding that there were no questions of material fact as to plaintiffs' claims under its collective bargaining agreement with the defendant and under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* We agree with the district court that summary judgment was appropriate on the ERISA claims and some of the contractual claims. However, we believe that plaintiffs' prospective contractual claims do not present a present, justiciable controversy and therefore we dismiss them as not ripe for adjudication.

## FACTS

Defendant Cyclops Corporation, a manufacturer of steel and related products, owned and operated a production facility near Portsmouth, Ohio. Plaintiff United Steelworkers Union local # 2116 has represented the Portsmouth bargaining unit in negotiations with Cyclops and its predecessors since the 1940's. Cyclops and the local last entered into a collective bargaining agreement on July 24, 1980. This pact extended the coverage of existing pension and employment agreements until July 31, 1981.

In early 1980, Cyclops unsuccessfully attempted to sell the entire Portsmouth facility as a going concern. It did, however, succeed in selling the coke plant operation to New Boston Coke Corporation, a wholly owned subsidiary of McLouth Steel Corporation, on November 21, 1980. New Boston, which had decided to hire 227 of Cyclops' former employees, entered into a collective bargaining agreement and a pension agreement with local # 2116 on November 10, 1980. These agreements were virtually identical to the contracts to which Cyclops and the union had previously agreed. As a part of the sale agreement, New Boston agreed to assume all accrued pension liabilities while Cyclops agreed to transfer that portion of its pension fund that was attrib-utable to the Cyclops employees who would continue their employment with New Boston. Pursuant to this agreement, Cyclops transferred $168,380 in pension assets to New Boston's pension plan on February 6, 1981.

Following these transactions, New Boston petitioned the United States Bankruptcy Court for the Eastern District of Michigan for reorganization under Chapter 11 of the Bankruptcy Act. The bankruptcy trustee has continued to operate the Portsmouth coke plant and there has been no default on pension payments by New Boston.

Appellants filed a complaint on July 18, 1983. The complaint alleged that Cyclops had violated its collective bargaining agreement with local # 2116 by underfunding the pension accounts that it transferred to New Boston and by failing to obtain the consent of the court to the pension transfer. They further claim that Cyclops violated its fiduciary duty under 29 U.S.C. §§ 1103 and 1104 by engaging in a transaction that was not in the best interests of the pension plan and violated 29 U.S.C. § 1106 by conducting a prohibited transaction involving pension fund assets.

The district court, in an order dated January 20, 1987, 653 F.Supp. 574, granted defendant's motion for summary judgment on all of the above claims, stating that:

> Justice has been done in this action, as both parties have fulfilled their obligations and received the benefits of the sale of the coke plant. For its part, defendant has sold the coke plant. Plaintiffs retained their jobs as well as their pension rights built over a career of service with Cyclops. Defendant has paid its share of the pension obligations to New Boston, and New Boston has received experienced and valued workers guaranteeing them the same pension as they had with Cyclops. Fairness dictates that plaintiffs not be able to recover twice for the years of service accumulated through employment with Cyclops.
>
> The actions of defendant with regard to plaintiffs and their pension agreement was therefore fair, equitable and just.

Appellant now brings a broad-based appeal, claiming that the district court misperceived both the law and the facts.

## I. The Collective Bargaining Agreement

Appellants' first cause of action is based on the 1977 pension agreement that local #2116 entered into with Cyclops. Both parties have stipulated to the fact that the pension agreement is a part of the collective bargaining agreement between the parties.

Appellants' brief does not specify which provisions of the pension agreement have allegedly been violated. Instead, appellants simply claim that the transfer of pension assets without the consent of local #2116 violates the pension agreement. The union argues both that pension assets and liabilities could not be transferred without its consent and that the sale of the coke facility, as it affects union employment, could not take place without the union's consent.

The district court, in considering appellants' claim, examined the individual sections of the agreement. The court first noted that Paragraph 1.3 states that "benefits shall be provided by the Company or caused to be provided by the Company for the participants." Paragraph 8.1 echoes this flexibility, stating:

For the purpose of supplying the benefits herein provided, the Company may establish or cause to be established a trust or trusts or may utilize any existing trust or trusts heretofore established by or on behalf of the Company. The Company is free to determine the manner and means of making provision for funding and paying the benefits set forth in this Agreement.

The court then noted that while Cyclops was permitted, under the Agreement, to choose its means of payment, it was still liable for benefits. The court found that under Paragraph 9.2, "[a]ny benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this Agreement." The court interpreted this paragraph as meaning that Cyclops retained a duty toward the union, even after

selling the coke plant. However, the court found that Cyclops had met this duty, at least for the present, through its transfer of $168,380 of the pension fund:

To fulfill its obligation under the pension plan, Cyclops, through the Trustee of the Cyclops Hourly Plan, transferred assets totalling $168,380, plus interest since October 31, 1980, to a bank designated as the New Boston Plan Trustee. The $168,380 represents the portion of Cyclops Hourly Plan assets which Cyclops actuaries, TPF & C, advised was allocable to the listed employees at the Cyclops Portsmouth facility pursuant to the federal law governing contributions to pension plans. The evidence is undisputed and reasonable minds can only conclude that the $168,380 was Cyclops obligation under its pension plan agreement with plaintiffs to the listed employees at the Cyclops Portsmouth facility for the payment of future pension obligations which had arisen from the employees' years of service with Cyclops. This payment of over $150,000 is the "safety net" requested by plaintiffs and required by federal law.

Thus, the court found that there was no violation of the collective bargaining agreement on this ground. The court further found that the sale of the coke plant itself did not violate any rights protected by the pension plan. We agree, and affirm that part of the district court's opinion which grants summary judgment to Cyclops on plaintiffs' present collective bargaining agreement claims.

However, implicit in the parties arguments is a dispute that is prospective in nature. The union argues essentially that while Cyclops may have fulfilled its obligations to pay into the pension fund at the minimum amount required by the pension agreement and ERISA, this was not Cyclops' only obligation under the collective bargaining agreement and the pension plan established thereby. The union argues that Cyclops remains potentially liable for that portion of the transferred employees' future pension benefits which is attributable to their years of service with Cyclops.

While the $168,380 paid by Cyclops represents its funding obligation under ERISA, the payment does not limit Cyclops' ultimate potential liability.[1] Should the assets held by the New Boston plan prove insufficient to meet that liability, the union claims that Cyclops would remain obligated to make up the difference. That Cyclops may have a hold harmless or other contractual promise from New Boston is a matter of concern for Cyclops, not the union. The union states that it has neither been asked nor has it agreed to release Cyclops from such an obligation, and the provisions of ERISA are not intended to eliminate that deficiency. Thus, if New Boston should be unable, through insolvency or otherwise, to make good on its obligations, the union wishes it established *now* that Cyclops will not at that time be relieved of its underlying obligation.

A contrary rule, argues the union, would allow the company to avoid its obligation to pay the difference between its funded obligation and its potential liability by the transfer of employees or the sale of a division of its activities to an unsound purchaser. The union argues that such a transaction would permit an employer to rid itself of potential pension liability, without the consent of the union with whom it has contracted to pay benefits.

Both parties seek from us a definitive ruling on this question. Cyclops would have us rule that it is completely relieved of all potential future liability. The union would have us hold exactly the opposite. Even though the district court may have properly held that there has been no present breach of the collective bargaining agreement by Cyclops and, further, no violation of ERISA, the union and its affected members are concerned that the language

of the district court's opinion will be found to foreclose any future possibility of relief against Cyclops. Such a holding would prevent the union from claiming at a later date that New Boston, through insolvency or otherwise, was unable or unwilling to meet the pension obligations transferred by Cyclops and that therefore, Cyclops was liable for the unpaid benefits.

The heart of the parties' disagreement is found in the following language of the district judge's opinion:

As to defendant's contention that a novation has taken place, reasonable minds can only conclude from the undisputed material facts, that plaintiffs did not agree to a substituted contract. Rather, the evidence leads only to the conclusion that plaintiffs did not discharge Cyclops from its original duty under the pension plan, but added New Boston to be responsible for pension benefits earned for plaintiffs' efforts at New Boston, when plaintiffs determined to continue with employment at New Boston instead of retiring from Cyclops. Thus, both Cyclops and New Boston owe a duty to plaintiffs, however, Cyclops has fulfilled its duty to plaintiffs by the payment of its allocable contribution to the New Boston Plan and its agreement with New Boston.

Cyclops asserts that the district court's language finding that "Cyclops has fulfilled its duty ..." means that it is discharged from any further liability, regardless of any future default by New Boston or its successors. The union desires an opposite construction. It would have preferred that the district court had held that "... Cyclops has fulfilled its [present] duty to plaintiffs," accompanied by an express holding that Cyclops is not relieved of fu-

---

1. For example, the union in its brief argues: Schedule B to Form 5500 (Plaintiffs' App. p. 213) discloses that the enrolled actuary for the New Boston plan, The Wyatt Company, calculated the present value of the vested benefits for the 227 plan participants at Three Million Two Hundred Sixty Thousand, Five Hundred Dollars ($3,260,500.00). The total accrued liabilities as of 12–1–80, were Three Million Nine Hundred Ninety–Two Thousand Seven Hundred Dollars ($3,992,700.00). This is the

liability which was transferred from Cyclops to the New Boston Coke Corporation and which the Court below has held was offset by the payment One Hundred Sixty–Eight Thousand Three Hundred Eighty Dollars ($168,380.00).

One does not have to be an actuary to calculate that $168,380.00 cash will not provide pension benefits of nearly Four Million Dollars for Two Hundred Twenty–Seven (227) employees....

ture liability in the event of some future default.

Our review of the case law and legislative history reveals no definitive answer to the question raised by the parties. Likewise, we are uncertain of the intentions of the district court embodied in the cited portions of its opinion. It is at best ambiguous, but is probably more consistent with the position taken by Cyclops.

█ Before addressing this question, we must determine whether the issue of Cyclops potential, future liability is ripe for adjudication. Paragraph 9.5 of the pension agreement provides that:

> Neither any participant prior to his retirement under conditions of eligibility for pension benefits nor any surviving spouse prior to eligibility for a surviving spouse's benefit shall have any right or interest in or to any portion of any funds which may be paid into any pension trust or trusts heretofore or hereafter established for the purpose of paying pensions and no participant, co-pensioner or surviving spouse shall have any right to pension benefits except to the extent provided in this Agreement. Employment rights shall not be affected by reason of this Agreement.

Thus, the only individuals who have any interest in their pensions are those who have already retired. However, the parties have stipulated to the facts that New Boston has not failed in meeting its pension funding obligations and that all employees who have applied for a pension have received one.[2] Since current employees have no contractual rights that they could vindicate in this action, while those already retired have had none of their rights violated, we hold that as to the individual plaintiffs in this action, the prospective contractual claims are not ripe.

However, we believe that the justiciability of the union's claim presents a much closer question. Like the individual employees, the union cannot point to an obvious and immediate breach of the contract. However, unlike its employees, the union is a party to the collective bargaining agreement. Thus, it could claim that it has a right to adjudicate issues that threaten the security of its contract. Here, the union's security may be threatened by Cyclops' transfer of pension fund liabilities to a company that is now involved in Chapter 11 proceedings.

The Supreme Court has stated that the basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985). We have both echoed and refined this sentiment. *See, e.g., Brown v. Ferro Corp.,* 763 F.2d 798, 801 (6th Cir.1985) ("The ripeness doctrine not only depends on the finding of a case and controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances."); *Young v. Klutznick,* 652 F.2d 617, 625 (6th Cir.1981) ("Courts must first 'determine whether the issues tendered are appropriate for judicial resolution,' and then 'assess the hardship to the parties if judicial relief is denied at that stage.'" (quoting *Toilet Goods Association v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967)).

█ In undertaking a ripeness analysis, we weigh several factors. We pay particular attention to the likelihood that the harm alleged by plaintiffs will ever come to pass. *See, e.g., Thomas,* 473 U.S. at 580–81, 105 S.Ct. at 3332–33 (finding a case not ripe when it involved "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (citing 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532 (1984).)); *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (requiring a "realistic danger of sustaining a direct injury....").

---

2. The stipulation of the parties explicitly excepts Charles Rose. However, the factual circumstances of the denial of his pension do not affect this case.

In the instant case, it is far from clear that New Boston will ever fail to meet its pension obligations. While it is true that McLouth Steel is a party to a Chapter 11 bankruptcy proceeding, it is also true that no pension payments or funding requirements have been neglected. Further, Cyclops claims that even in the event of a default by New Boston, the Pension Benefit Guarantee Corporation [PBGC] would pay the applicable benefits.[3] While the parties have not briefed this issue extensively, our understanding of the PBGC leads us to conclude that there is a strong possibility that it would be liable to the members of the union for pension benefits in the case of a default by New Boston.[4]

■ A second factor that we must consider is whether the factual record of this case is sufficiently developed to produce a fair and complete hearing as to the prospective claims. In the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Court stated that "there are situations where, even though an allegedly injurious event is certain to occur, the Court may delay resolution of constitutional questions until a time closer to the actual occurrence of the disputed event, when a better factual record might be available." *Id.* at 143, 95 S.Ct. at 358. The Court expounded on this statement later, when it observed:

> For example, the controversy over the proper valuation theory to be applied to both the rail properties and the stock of Conrail provided as compensation depends upon contingencies that argue forcefully for postponement of its resolution. The parties have stipulated that it

will be impossible to ascertain until the Final System Plan is effective which rail properties will be transferred to Conrail, or their value on *any* valuation theory, or the value of the consideration to be exchanged for the rail properties.

*Id.* at 146, 95 S.Ct. at 360.

In this case, there are several facts which militate for delaying any decision. Even assuming that New Boston fails to meet some of its pension obligations following the completion of Chapter 11 proceedings, we are unsure as to whether it will be able to pay a part of those benefits and how large that part will be. Further, we do not know what the statutory maximum for PBGC benefits, which has changed several times, would be at the time of New Boston's default. Thus, even if New Boston does default on its obligations, it is quite possible that Cyclops may have no residual liability. Such a determination depends upon facts that would only become clear at the time, if any, when New Boston defaults.

■ The final factor that we must consider is the hardship that refusing to consider plaintiff's prospective claims would impose upon the parties. In *Pacific Gas & Electric Co. v. Energy Resources Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), the Court stated that "[i]n *Abbott Laboratories*, which remains our leading discussion of the doctrine, we indicated that the question of ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Id.* at 201, 103 S.Ct. at 1720 (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136,

---

**3.** The Pension Benefit Guarantee Corporation is a federal agency created pursuant to ERISA for the purpose of guaranteeing monthly pension benefits provided by defined benefit pension plans. 29 U.S.C. § 1301 *et seq.*

**4.** Cyclops argues that under 29 U.S.C. § 1322(b)(3)(A)–(B), the maximum monthly amount of pension benefits guaranteed by the PBGC is $1,857.95. It claims that this amount is greater than the largest accrued pension benefit of any Cyclops employee at the time of the sale of the coke plant to New Boston. However, it would appear that such a claim would not totally eliminate Cyclops' potential liability. While

the portion of pension benefits that is attributable to Cyclops may be less than the statutory maximum, the payment owed to employees who continued with New Boston after working for Cyclops could exceed that maximum figure. If that were to be the case, the share of the PBGC benefits attributable to an employee's work for Cyclops could well be below the monthly benefit owed by Cyclops to such an employee. The very difficulty of making such calculations at this time further strengthens the case for finding that the union's prospective claim is non-justiciable, as will be discussed later.

149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

Here, we believe that a delay in the litigation of this hypothetical claim would not unduly prejudice plaintiffs' interests. The union could claim that a statement by a court that Cyclops remained liable on the collective bargaining agreement could permit it to take further action against Cyclops to insure that it is maintaining adequate funds to meet this potential liability. However, we see nothing in the collective bargaining agreement or in the federal common law of contracts that would afford plaintiff such a right. Thus, the union would be left with a declaration of future, hypothetical rights and no present means with which to enforce it.

Similarly, Cyclops could claim that the issue should be decided on its merits so that it could utilize all of its corporate funds without fear of having to reserve a portion to pay pension benefits to the workers who were transferred to New Boston. As we have just noted, Cyclops would not be required to maintain a separate account for these funds. Any other decision based on the fear of potential pension liability, such as a decision to avoid risky investments or rapid expansion, is too speculative for us to consider as a concrete effect of our holding on justiciability.

Further, if we were to declare that Cyclops did not have any remaining duty to pay benefits to union members, it would also have little impact upon the behavior of the parties. The union, one can only assume, already intends to pursue its remedies against New Boston and the PBGC if there is a default. This decision would not change that position. Further, Cyclops is already basically free to invest its funds as it chooses, and its freedom would be expanded only slightly by a decision firmly eliminating its potential liability here.

■ Considering all of these factors, we must conclude that while an opinion resolving Cyclops' prospective liability for pension benefits could have some present impact, it would function primarily in a hypothetical capacity. Thus, we must conclude that the district court's opinion granting defendant's summary judgment motion erred to the extent that it held that defendant was entitled to summary judgment on the issue of its prospective liability.

While we have stated that the question of prospective benefits is not ripe, we do not mean to imply that appellants' future right to litigate this question is necessarily foreclosed. As we noted previously, Paragraph 9.2 of the Agreement states that "[a]ny benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this Agreement." We believe that this provision may leave the union with a potential cause of action, irrespective of our decision as to whether Cyclops complied with ERISA's funding requirements. While ERISA merely provides minimum funding requirements for pension plans,[5] this provision would appear to be a promise to pay benefits, regardless of the fact that funding may have also been technically adequate.

Both the Supreme Court and this court have repeatedly considered cases pertaining to the interpretation of pension plan provisions of collective bargaining agreements under both section 502(a) of ERISA, 29 U.S.C. § 1132(a), and section 301 of the Labor Management Relations Act, 29 U.S.

---

5. H.R.Rep. No. 533, 93d Cong., 2nd Sess. at —— (*reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4640) underscores the fact that ERISA was intended to provide only minimum standards for pension plans:

In broad outline, the bill is designed to:
 (1) establish equitable standards of plan administration;
 (2) mandate minimum standards of plan design with respect to the vesting of plan benefits;
 (3) *require minimum standards of fiscal responsibility* by requiring the amortization of unfunded liabilities;
 (4) insure the vested portion of unfunded liabilities against the risk of premature plan termination; and
 (5) promote a renewed expansion of private retirement plans and increase the number of participants receiving private retirement benefits.

C. § 185.[6] *See, e.g., Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 76, 102 S.Ct. 851, 855, 70 L.Ed.2d 833 (1982); *In re White Farm Equipment Co.,* 788 F.2d 1186, 1190 (6th Cir.1986); *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 610 (6th Cir.1985).

We have further stated that an individual or a union may enforce a promise by an employer to provide pension benefits that are in excess of the minimum standards guaranteed by ERISA. In *White Farm,* plan members sought to enforce plan documents providing for mandatory vesting of retiree welfare benefits, even though this was not a requirement of ERISA. A panel of our court held:

> the parties may themselves set out by agreement or by private design, as set out in the plan documents, whether retiree welfare benefits vest, or whether they may be terminated. In construing such agreements, courts may draw inferences or make presumptions as this court has done in construing collective bargaining agreements providing welfare benefit plans.

*Id.* at 1193. Other courts have also adopted their position. *See, e.g., International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Keystone Consolidated Industries, Inc.,* 793 F.2d 810, 814 (7th Cir.1986) ("ERISA does not forbid parties to collectively bargain for obligations greater than, and separate from, the ERISA minimum funding obligations."); *Murphy v. Heppenstall Co.,* 635 F.2d 233, 239 (3d Cir.1980) ("ERISA established "minimum standards" for pension payments due retired employees.... It is not inconsistent with the statutory scheme to permit employees to recover directly from the employer any additional benefits to which the employer has contractually obligated itself.").

While ERISA's preemption provision, 29 U.S.C. § 1144,[7] is rather sweeping, it does not alter the outcome of this case. In suits to enforce collective bargaining agreements, courts rely on the federal common law of labor relations. *See, e.g., Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957); *Apponi v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1215 (6th Cir.1987); *White Farm,* 788 F.2d at 1191. While state law may be utilized by federal courts in creating federal common law, it is imbued with federal character by virtue of its incorporation into that common law. *Holliday v. Xerox Corp.,* 555 F.Supp. 51, 55 (E.D.Mich. 1982).

■ At oral argument, appellants' counsel suggested that if appellants were unable to bring an action until New Boston defaulted on its pension obligations, they would run the risk of being barred by the statute of limitations. We disagree. We have already stated that there has been no present breach of the collective bargaining agreement. The statute of limitations will not begin to run unless or until Cyclops fails to meet a pension obligation to a union member. At that time, the Ohio limitations period for breach of contract will determine how long the union or one of its members has to institute a suit in a timely manner. *See, e.g., International Union, UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 703–04, 86 S.Ct. 1107, 1111–12, 16 L.Ed.2d 192 (1966); *Apponi,* 809 F.2d at 1216; *Central States Southeast and Southwest Ar-*

---

**6.** Section 502(a)(1)(B) of ERISA provides:

> A civil action may be brought—(1) by a participant or beneficiary ... (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought

in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**7.** 29 U.S.C. § 1144(a) provides:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title....

*eas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1107 (6th Cir.1986) (en banc).

## II. The ERISA Claims

### A. Breach of Fiduciary Duty

Appellants claim that Cyclops' sale of the coke plant and pension plan was accomplished through a breach of the fiduciary duty of the plan's trustees, who are also Cyclops officers. While appellants' brief does not separate the various fiduciary duty questions clearly, we believe that their allegations are based on three separate sets of facts: (1) insufficient funding of the New Boston plan; (2) Cyclops' desire to avoid pension liabilities by a sale of the pension fund; and (3) concern over the potential insecurity of pension funding by New Boston.

Appellants' claims all stem from language found in 29 U.S.C. §§ 1103 and 1104. 29 U.S.C. § 1103(c)(1) provides in pertinent part that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1) provides in pertinent part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

As an initial matter, we note that a corporation's fiduciary duties under ERISA do not encompass all of its activities. *See, e.g., Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986) *cert. denied*, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) ("[T]he ERISA scheme envisions that employers will act in a dual capacity as both fiduciary to the plan and as employer. ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets."); *Amato v. Western Union International, Inc.*, 773 F.2d 1402, 1417 (2d Cir.1985) (dis-

tinguishing decisions made as an employer from those made as a plan fiduciary). However, we believe that the fiduciary duty rules are applicable to the instant case. While the decision to sell the coke plant itself was a corporate decision that may have been outside of the scope of ERISA's protective rules, there is no question that the sale of the pension plan to New Boston was a transaction that was of direct concern to the 227 workers who were transferred. As such, any decisions regarding the sale of the pension plan are subject to review under ERISA's fiduciary duty standards.

Appellants first claim that Cyclops' failure to transfer pension fund assets that were sufficient to fully fund the plan violates the fiduciary duty provisions. Appellants make this claim despite the fact that both parties have stipulated that:

> On February 6, 1981, the Trustees of the Cyclops Hourly Plan transferred assets in the amount of $168,380.00 plus interest since October 31, 1980, to the bank designated in the agreement as the New Boston Plan Trustee.

> This sum represents the portion of Cyclops Hourly Plan assets which Cyclops' actuaries, Towers, Perrin, Forster & Crosby (TPF & C), advised was allocable to the listed employees at the Cyclops Portsmouth facility, pursuant to the federal law governing contributions to pension plans.

It is unclear in appellants' brief whether they allege that this funding was, in fact, inadequate under ERISA or instead that the funding, although technically adequate, violates Cyclops' fiduciary duty. We explore both claims.

ERISA sets out the standard for the funding of merged, transferred or acquired pension plans in 29 U.S.C. § 1058:

> A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which

is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if the plan had then terminated).

The Secretary of the Treasury has promulgated a set of regulations, 26 C.F.R. § 1.414(I)–1, to determine whether a merger, sale or consolidation is appropriate. In order to apply these regulations to the instant case, we must determine whether the transfer of pension assets was (1) a merger or consolidation or (2) a transfer of assets or liabilities.

■ 26 C.F.R. § 1.414(I)–1(b)(2) defines a merger or consolidation as "the combining of two or more plans into a single plan. A merger or consolidation will not occur merely because one or more corporations undergo a reorganization...." 26 C.F.R. § 1.414(I)–1(b)(3) defines a transfer of assets or liabilities as a situation "when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan." Given the continued existence of both the Cyclops and New Boston Plan and the transfer of assets and liabilities from Cyclops to New Boston, it is clear that the transaction between the two parties was a transfer of assets or liabilities.

26 C.F.R. § 1.414(I)–1(o) dictates the procedure for determining the adequacy of funding in the case of a transfer of assets or liabilities, stating "[a]ny transfer of assets or liabilities will for purposes of section 414 [the Internal Revenue Code equivalent of 29 U.S.C. § 1058] (1) be considered as a combination of separate mergers and spinoffs [8] using the rules of paragraphs (d), (e) through (j), (l), (m), or (n) of this section, whichever is appropriate." In this case, for the transaction to be valid under ERISA it must meet the requirements of 26 C.F.R. § 1.414(I)–1 sections (e) and (n).

Section (n), which regulates spinoffs states:

In the case of a spinoff of a defined benefit plan, the requirements of section 414(I) will be satisfied if (i) All of the accrued benefits of each participant are allocated to only one of the spun off plans, and (ii) The value of the assets allocated to each of the spun off plans is not less than the sum of the present value of the benefits on a termination basis in the plan before the spin off for all participants in that spun off plan.

Section (e), which regulates mergers, uses virtually identical language.

■ While the Cyclops plan did not have sufficient assets to cover the present value of all accrued benefits, it was still permitted to spin off the 227 participants and then merge them with the New Boston plan under sections (e) and (n) because the regulation merely requires that assets equal the value of benefits calculated on a *termination basis*. This term is defined at 26 C.F.R. § 1.414(I)–1(b)(5) as "benefits that would be provided exclusively by the plan assets pursuant to section 4044 [Codified at 29 U.S.C. § 1344] of the Employee Retirement Income Security Act of 1974 ("ERISA") and the regulations thereunder if the plan terminated."

29 U.S.C. § 1344 sets out the order in which benefits are to be paid when a plan terminates. It provides that in the case of underfunding, assets are to be allocated according to prioritized categories. Since a merged or spunoff plan must only be capable of paying benefits on a termination basis, it is not significant that fund assets are currently smaller than the present value of accrued benefits. ERISA does not require that assets be equivalent to liabilities at the time of transfer, only that the transfer is not used as an excuse to undercut the funding of a protected plan. In truth, we believe this to be the principal concern of plaintiffs here. The concern is legitimate and deserving of our most careful scrutiny. Nevertheless, we conclude that its resolution cannot be based upon

---

8. A spinoff is defined at 26 C.F.R. § 1.414(I)–1(b)(4) as "the splitting of a single plan into two or more plans."

unresolved speculation over future payment of benefits.

The actuarial statement regarding the transfer of assets and liabilities of the Cyclops plan concluded that since "the total present value of Category 3 benefits exceeded the fair market value of the Plan's assets as of September 30, 1980, such assets were allocated to Coke Plant Employees · in proportion to their Category 3 present values." As the parties have stipulated to the fact that the actuarial calculations were correct, and it is clear that those calculations determined the termination basis value of the Cyclops plan, we find that there was no violation of 29 U.S.C. § 1058 in the transfer of assets to New Boston.

 While Cyclops has complied with the provisions of section 1058, it may be still possible for appellants to claim that technical compliance which leaves the New Boston employees without adequate funding is a breach of fiduciary duty. However, appellants fail to cite any precedent on this question. Further, we have found several cases in which pension plan assets and liabilities were transferred to another plan without making provision for the pro rata distribution of the fund's surplus. Courts confronted with this situation have held that compliance with the strict requirements of ERISA was all that was required. Thus, they have refused to order the distribution of surpluses.[9] In light of these cases, we are convinced that the failure to fund a transferred pension plan with more assets than are required by the specific provisions of ERISA cannot form the basis for a breach of fiduciary duty claim under either section 1103 or 1104.

Appellants' next contention is that Cyclops officers who were also trustees of the plan failed to act for the sole benefit of the plan. Appellants rely on the language of 29 U.S.C. § 1104(a)(1)(A)(i) which states that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." However, appellants fail to mention precedent, both in this circuit and elsewhere, that has interpreted this language in less absolute terms.

We recently considered this question in *Holliday v. Xerox Corp.*, 732 F.2d 548 (6th Cir.1984). In *Holliday*, Xerox had set up two pension fund accounts for each employee. One account was strictly for retirement use (the "retirement account") while the other was subject to limited encroachment by the employee prior to retirement (the "optional account"). Xerox then decided to create a new guaranteed minimum retirement plan. Xerox determined the amount that an employee was to receive under the new plan by subtracting benefits payable under the "retirement account" from the baseline level of the new plan. However, benefits from the "optional account" were not subtracted. Prior to the initiation of the new plan, Xerox had acquired several other companies, whose employees had been included under the old Xerox plan. Many of these employees had chosen to place their assets into the "optional account" at the time of merger. However, after Xerox instituted its new system, it transferred those assets from "optional account" to "retirement account" status.

Holliday contended that such a transfer amounted to a breach of fiduciary duty because the decision benefited Xerox instead of being for the sole benefit of the pension plan. A panel of our court held that Xerox's activity did not constitute an ERISA violation. We stated that:

ERISA ... cannot be read as a prohibition against any decisions of an employer with respect to a pension plan which have the obvious primary purpose and effect of benefitting the employees, and in addition the incidental side effect of being prudent from the employer's economic perspective. As the legislative history makes clear, ERISA recognizes the inherent tension between the desire

---

**9.** *See, e.g. Foster Medical Corp. Employees Pension Plan v. Healthco, Inc.*, 753 F.2d 194, 199 (1st Cir.1985); *Sutton v. Weirton Steel Division of* *National Steel Corp.*, 724 F.2d 406, 411 (4th Cir.1983); *Bigger v. American Commercial Lines, Inc.*, 677 F.Supp. 626, 630 (W.D.Mo.1988).

that employees retire with adequate retirement income and the practical internal pressures exerted on the trustees charged with preserving the assets of the pension fund. While ERISA resolves this conflict resoundingly on the side of the employees, Congress did not intend the Act to penalize employers for exercising their discretion to make rational economic decisions which are both in the best interest of the preservation of the fund and which are also not adverse to the employer's interest.

*Id.* at 551–52.[10]

In the instant case, Cyclops was able to sustain the employment of 227 individuals through its sale of assets to New Boston. Cyclops transferred the proportionate share of its pension assets to New Boston. Finally, New Boston agreed to a pension agreement that is virtually identical to the one that Cyclops and the union had negotiated. The effect of these transactions was to keep the coke plant in operation and to keep some of Cyclops' employees working after the Portsmouth plant was all but dead. While Cyclops did assign some of its pension funding liabilities as a part of this transaction, the *Holliday* decision and the holdings of other courts con-

vince us that Cyclops has not violated ERISA sections 1103 and 1104 in any way.

### B. Prohibited Transactions

Appellants further allege that Cyclops is in violation of various sections of 29 U.S.C. § 1106.[11] Appellants' allegations boil down to two major arguments. First, they contend that Cyclops, as a plan fiduciary, caused the plan to engage in a sale or transfer of assets to New Boston, a party in interest. Second, appellants claim that Cyclops profited from dealing in the assets of the plan.

Both parties accept the fact that Cyclops was a fiduciary with respect to the pension plan. Thus, in order to establish a violation of 1106(a) appellants must establish that New Boston was a party in interest and that Cyclops sold or transferred assets of the pension fund to it.

Appellants rely on the language of 29 U.S.C. § 1002(14)(C) for the proposition that New Boston is a party in interest. That provision states that "[t]he term 'party in interest' means, as to an employee benefit plan—... an employer any of whose employees are covered by such plan." Appellants claim that after it began to operate the coke plant with the employ-

---

**10.** Other courts have also held that decisions regarding pension plans that also serve the interest of the corporation funding the plan are not, for that reason alone, breaches of fiduciary duty. *See, e.g., Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982) ("officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which ... they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation ..."); *Phillips v. Amoco Oil, Inc.,* 614 F.Supp. 694, 719 (N.D.Ala.1985) *aff'd* 799 F.2d 1464 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) (A corporation selling off a division has no "fiduciary duty under ERISA to act soley in the plaintiffs' interests in negotiating the terms upon which the LPG operations were to be sold. A contrary holding would mean that every corporate business decision which had any possible collateral effect on pension benefits would have to be made 'solely in the interest of pension plan beneficiaries and participants.' ").

**11.** Appellants allege violations of the following portions of 29 U.S.C. § 1106:

(a) Transactions between plan and party in interest

Except as Provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest ...

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ees it received from Cyclops, but before the entire transfer of the facility was completed, the New Boston workers were covered by the Cyclops plan. To support this argument, they cite to a provision of the purchase agreement which states that up until the closing date of the purchase, New Boston "shall assume all liability and expense for the accrued pensions ... of the applicable hourly and salaried pension plans of Cyclops...."

■■■ We disagree. 29 U.S.C. § 1002(14)(C) applies to this situation, if at all, in the most technical sense. It is not even clear whether the transferred employees could be considered to have been working for New Boston prior to the time of the closing of the purchase agreement. Moreover, a reading of the provision in the context of the rest of ERISA clearly demonstrates that the drafter of this provision did not intend to treat the instant situation as a prohibited transaction. 29 U.S.C. § 1058 specifically provides the correct procedure that must be undertaken in order to effect a proper merger of pension plans. Appellants' interpretation of section 1002(14)(C) brings the provision into conflict with section 1058's permissive attitude toward mergers. As we are bound to construe statutes in such a way as to avoid internal conflicts whenever possible, *United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1184 (6th Cir.1982), we find that

appellants' interpretation of section 1002(14)(C) is incorrect.

We further note the fact that appellants have not provided us with even a single example of a case in which arrangements surrounding the merger or spinoff of a pension plan were found to violate any of the provisions of 29 U.S.C. § 1106.[12] Thus, we must conclude that the district court was correct in its determination that appellants could not establish a valid 1106(a) claim.[13]

Even though we conclude that New Boston was not a party in interest, we must still consider appellants' allegations that Cyclops violated 29 U.S.C. § 1106(b). Appellants' claim is basically similar to the one that he made under 1104: Cyclops' dumping of pension plan liabilities on New Boston allowed Cyclops to profit from dealing in pension plan assets and liabilities. We agree with appellants that Cyclops, as a part of its sale of the coke facilities, transferred pension plan assets to New Boston that were insufficient to cover the present value of accrued liabilities. However, we do not believe that this act constitutes a violation of section 1106(b).

A corporation that is selling off a division and transferring employees to the buying corporation has considerable flexibility as to the methods it employs in funding the pensions of the transferred workers, as long as it complies with the requirements of ERISA that we have already discussed.[14]

12. We do note, however, that a recent opinion of our court, *Varhola v. Doe*, 820 F.2d 809 (6th Cir.1987), discussed the question of an 1106(a) violation in the identical context that we face today. In another suit instituted in the aftermath of the sale of the coke plant, certain transferred employees sued to obtain permanent shutdown pensions from Cyclops. Appellants claimed that 1106(a)(1)(D) was violated when Cyclops transferred pension assets to New Boston. We disagreed, stating that "[i]f on remand the District Court determines that plaintiffs were entitled to shutdown pensions, this issue will be resolved. If the Court finds that plaintiffs were not entitled to such pensions, however, then defendants' transfer of the assets was a purely ministerial act which would not give rise to liability under this section." *Id.* at 818.

13. Because we conclude that New Boston is not a party in interest, it is not necessary for us to

consider Cyclops' argument that the transaction was exempt from section 1106 because of the exception provided in 29 U.S.C. § 1108(b)(9).

14. *See, e.g.,* Goodman, *Employee Benefit Plans in Business Reorganizations,* 468 Pens. Plan Guide (CCH) at 10 (March 16, 1984) ("In taking over an organization with an existing pension plan, there usually is a question of how to treat the unfunded liabilities under such plan. The seller may pay off such liabilities, giving the purchaser a clean start with the plan. However, as part of the buy-out agreement, the purchaser may agree to pay the accrued liabilities."); *cf. David R. Webb Co., Inc. v. Commissioner,* 708 F.2d 1254 (7th Cir.1983) (tacitly approving the sale of pension liabilities as part of a merger agreement while determining the tax consequences of such an act).

Several courts have recognized ERISA's built in flexibility and given a narrow construction of 29 U.S.C. § 1106.[15]

■ In the instant case, we have already demonstrated that Cyclops did not determine the security of the pensions of the employees that it transferred to New Boston. Instead, it complied fully with the requirements of ERISA. Furthermore, to have transferred additional funds to the new pension fund would have created a disadvantage to those employees who are still covered under the Cyclops plan. Cyclops owes these employees the same fiduciary duties that it owes to appellants. Further, while it is true that New Boston's assumption of Cyclops' pension liabilities may have led to an adjustment in the purchase price of the coke facility, Cyclops does not reap a windfall from this adjustment. Instead, it merely decreased it liabilities instead of increasing its assets in the form of the additional cash that New Boston could have paid instead of absorbing the pension liabilities. Thus, Cyclops did not deal in its pension assets for its own benefit and did not violate 29 U.S.C. § 1106(b).

*III. Appellants Motion to Strike*

A final matter to consider is appellants' claim that the district judge erred in refusing to strike certain affidavits for failing to comply with Fed.R.Civ.P. 56(e) and in refusing to award appellants attorney fees under Fed.R.Civ.P. 56(g) for appellants' defense to arguments made by Cyclops that relate to other documents that were, in fact, stricken. Our review of the district court's decisions under Rule 56 is limited to a search for an abuse of discretion. Since we find that the court was well within its discretion in denying appellants'

motion below, the judgment of the district court on this issue is affirmed.

We therefore VACATE the judgment of the district court and DISMISS appellants' claims relating to the collective bargaining agreement. In all other respects, the judgment of the district court is AFFIRMED. No costs, neither party having fully prevailed.

MERRITT, Circuit Judge, concurring.

I agree with the result reached by the Court and agree with the Court's reasoning that plaintiffs have not offered proof showing a violation of ERISA in connection with the Cyclops–New Boston transaction. Neither have they shown a present violation of the collective bargaining agreement between the union and Cyclops. It seems self-evident to me, however, that Cyclops remains bound by the pension obligations of its contract with the union and will have to pay such obligations should New Boston default in paying the Cyclops obligations which it assumed. I have no hesitancy on ripeness grounds in so ruling in view of the explicit language of section 502(a)(1)(B) of ERISA [29 U.S.C. § 1132(a)(1)(B) ] authorizing "a civil action ... by a participant or beneficiary [of a pension plan] ... to clarify his rights to future benefits under the terms of the plan." *See Janowski v. International Brotherhood of Teamsters,* 673 F.2d 931, 935 (7th Cir.1982) (declaratory judgment action seeking determination of retirement rights was "precisely the type of action contemplated by the statute"), *vacated and remanded on other grounds,* 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); *Chambless v. Masters, Mates & Pilots Pension Plan,* 571 F.Supp. 1430, 1437–39 (S.D.N.Y.1983) (discussing ERISA,

---

15. *See, e.g., Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1417 (2d Cir.1985) ("We agree with the district court that our decision in *Donovan v. Bierwirth* [680 F.2d 263, 270 (2d Cir.1982) ] which rejected a broad interpretation of the transactions prohibited by ERISA 406, 29 U.S.C. § 1106, bars this claim."); *Evans v. Bexley,* 750 F.2d 1498, 1500 n. 3 (11th Cir.1985); *Coleman v. General Electric Co.,* 643 F.Supp. 1229, 1239 (E.D.Tenn.1986) ("[I]n general, an

employer's fiduciary duties do not extend to the negotiations of the sale of a going concern and are not violative of fiduciary duties described in [1106] ); *Phillips v. Amoco Oil Co.,* 614 F.Supp. 694, 720 (N.D.Ala.1985) *aff'd* 799 F.2d 1464 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987) ("Congress did not intend an expensive interpretation of Section 1106.").

"more generous ripeness criteria regarding the clarification of rights").